**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2104

DREAMSTREET INVESTMENTS, INC., d/b/a DS Builders, a North Carolina Corporation,

Plaintiff - Appellant,

v.

MIDCOUNTRY BANK, a Federal Savings Bank,

Defendant - Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Catherine C. Eagles, District Judge. (1:14-cv-00521-CCE-JEP)

Argued: October 25, 2016          Decided: November 30, 2016

Before WILKINSON, KING, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Harris wrote the opinion, in which Judge Wilkinson and Judge King joined.

**ARGUED:** Rachel Marie Stevens, DREAMSTREET INVESTMENTS, INC., Raleigh, North Carolina, for Appellant. Robert Eli Levin, HAYWOOD, DENNY & MILLER, L.L.P., Durham, North Carolina, for Appellee. **ON BRIEF:** Matthew Ivan Van Horn, LAW OFFICE OF MATTHEW I. VAN HORN, PLLC, Raleigh, North Carolina, for Appellant.

PAMELA HARRIS, Circuit Judge:

This case arises from a "seller holdback" agreement between Dreamstreet Investments, Inc., which was selling a vacant lot for home construction, and MidCountry Bank, which was financing the lot's purchase by a third party. Under the agreement, part of the purchase price owed to Dreamstreet instead would be retained by MidCountry, pending completion of the home and subject to certain conditions.

On June 16, 2009, Dreamstreet contacted MidCountry, challenging the propriety of the seller holdback agreement and threatening to sue. Over four years later, Dreamstreet made good on its threat. In a complaint filed on June 28, 2013, Dreamstreet alleged that MidCountry fraudulently induced it to enter into the seller holdback agreement, in violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). A subsequent amendment added a claim under the common-law doctrine of constructive fraud.

The district court granted summary judgment to MidCountry. Dreamstreet's UDTPA claim, the court held, was barred by the applicable four-year statute of limitations. And on the undisputed record facts, the court concluded, Dreamstreet could not establish the necessary elements of a constructive fraud claim. We agree, and for the reasons given below, we affirm the district court's decision.

2

At issue in this case is an agreement between two commercial entities: Dreamstreet, a real estate investment corporation; and MidCountry, a bank. The terms of that agreement are not contested. What is disputed is how the agreement came to be, and whether MidCountry has lived up to its obligations to Dreamstreet.[1]

The case began when Jason Pittman, through his company Dreamstreet Investments, entered into a purchasing agreement to sell an unimproved lot to Carl Ingraham for $115,000. Ingraham hoped to build a home on the property, and to fund his purchase, he applied for an owner-builder loan from MidCountry. An owner-builder loan would allow Ingraham to borrow the purchase price of the lot, and then, acting as his own general contractor, to make additional draws on the remaining loan amount to fund the construction of his home.

Under MidCountry's underwriting standards, Ingraham was required to make a down-payment of approximately $43,000 to qualify for the loan. But Ingraham was unable to meet this

---

[1] On review of a grant of summary judgment to MidCountry, we view the facts in the light most favorable to Dreamstreet, as the non-moving party. See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

requirement, and so Dreamstreet and MidCountry entered into the seller holdback agreement (the "Agreement") at issue here. Under the Agreement, Dreamstreet would forgo immediate receipt of $43,200 of the purchase price of the lot. That money instead would be retained by MidCountry, ensuring – according to MidCountry – that there would be sufficient funds to complete construction of Ingraham's home. Upon completion of the home, the money would be released to Dreamstreet.

Additional conditions of the Agreement were memorialized in an email sent and signed by Pittman on June 12, 2008, which the parties agree establishes the terms of their agreement. Under those terms, the $43,200 would not be disbursed to Dreamstreet if Ingraham defaulted on his MidCountry loan or failed to complete construction on his home. Specifically, the email stated: "I [Dreamstreet] understand that the only reason the holdback would not be available was if [Ingraham] was in default or unable to complete construction on the home and at that point MidCountry would use those remaining funds to complete construction on the home." J.A. 80.

After sending the June 12 email, Pittman contacted his attorney, his banker, and a real estate appraiser to discuss the seller holdback agreement because it did not "sound right" to him. J.A. 195. Pittman concluded that he would complete the transaction and sell the Dreamstreet lot to Ingraham only if

4

Ingraham provided him with a promissory note to cover the holdback, secured by a deed of trust on the property. On June 19, 2008, Ingraham and Dreamstreet executed a promissory note for $49,450, secured by a deed of trust, and closed on the sale of the lot.

A year later, shortly before the promissory note was due and after several unsuccessful attempts to contact MidCountry, Dreamstreet sent a lengthy email to MidCountry demanding immediate return of what it now viewed as the improper $43,200 holdback. According to the June 16, 2009 email, Pittman had consulted with his attorney, and it was their view that the holdback actually had "nothing to d[o]" with ensuring the availability of funds for Ingraham's construction project, and "never should have been held back in the first place." J.A. 86. Pittman promised to report MidCountry to the North Carolina Banking Commission and also to file a lawsuit against MidCountry: "[I] have already paid my attorney $1,000 to initiate this process," and "[w]e will be sending out complaints via certified mail on the 26th." Id.

For over four years, Dreamstreet failed to follow through on its threat. During that time, Ingraham defaulted on his loan with MidCountry. On February 25, 2010, MidCountry notified Ingraham that his mortgage loan had come due on September 19, 2009; that his failure to make payments on the loan in December

5

2009 and January and February 2010 had put him in default; and that MidCountry intended to commence foreclosure proceedings. At around the same time, on December 10, 2009, the county inspection department certified the construction on Ingraham's land as compliant with building and zoning regulations.[2] And on March 30, 2012, MidCountry foreclosed on Ingraham's home. Although Dreamstreet's promissory note against Ingraham was secured by a deed of trust on the property, it appears that Dreamstreet did not assert any security interest in connection with the foreclosure.

**B.**

Dreamstreet finally filed the promised suit against MidCountry on June 28, 2013.[3] Alleging that MidCountry fraudulently induced it to enter into the Agreement and never intended to release the $43,200 holdback, Dreamstreet raised claims under North Carolina's Unfair and Deceptive Trade

---

[2] Whether the Certificate of Compliance received by Ingraham demonstrated completion of Ingraham's home for purposes of the Agreement is disputed by the parties. We may assume for purposes of this appeal that the home was completed on December 10, 2009.

[3] Dreamstreet originally filed suit in North Carolina state court against Carl Ingraham and his wife, as well as MidCountry. After Dreamstreet voluntarily dismissed the Ingrahams as defendants, MidCountry removed the action to federal district court, invoking diversity jurisdiction. See 28 U.S.C. § 1332.

Practices Act and for common-law constructive fraud. MidCountry moved for summary judgment. Dreamstreet's UDTPA claim, it asserted, was barred by the applicable four-year statute of limitations. And the constructive fraud claim failed, MidCountry argued, because as a matter of law, Dreamstreet could not show the required element of a fiduciary relationship between the parties.

The district court granted MidCountry's motion for summary judgment in an oral ruling. It agreed with MidCountry that the four-year statute of limitations barred the UDTPA claim. On the constructive fraud claim, the district court assumed without deciding that there was a fiduciary relationship between MidCountry and Dreamstreet. But because Ingraham defaulted on his loan, the court concluded, the Agreement's conditions on release of the holdback were not satisfied, and thus MidCountry did not breach any fiduciary duty it may have owed to Dreamstreet. Dreamstreet timely appealed.

## II.

We review de novo the district court's grant of summary judgment. Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012). Summary judgment is appropriate only if no material facts are disputed and the moving party is entitled to judgment as a

matter of law.  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

## A.

Dreamstreet's first contention on appeal is that the district court erred in holding that its UDTPA claim is time-barred.  Under North Carolina law, UDTPA claims are governed by a four-year statute of limitations, and that limitations period begins to run when an alleged violation occurs.  See N.C. Gen. Stat. § 75-16.2 (setting out limitations period); Hinson v. United Fin. Servs., Inc., 473 S.E.2d 382, 386–87 (N.C. Ct. App. 1996) (applying UDTPA limitations period).  And when, as in this case, a UDTPA claim is based on alleged fraudulent conduct, then the violation occurs – and the limitations clock starts running – "at the time that the fraud is discovered or should have been discovered with the exercise of reasonable diligence."  Rothmans Tobacco Co., Ltd. v. Liggett Grp., Inc., 770 F.2d 1246, 1249 (4th Cir. 1985) (citing Wilson v. Crab Orchard Dev. Co., 171 S.E.2d 873, 884 (N.C. 1970)).

The parties do not dispute this governing framework.[4] Instead, they disagree as to whether Dreamstreet discovered or

_____

[4] Dreamstreet does suggest that it is "perhaps more appropriate" to analogize its action to one for breach of contract, in which case the limitations period would begin to run at the time of the breach.  Appellant Br. at 22; see Ring Drug Co. v. Carolina Medicorp Enters., Inc., 385 S.E.2d 801, 804 (Continued)

should have discovered the fraud of which it complains more than four years before it filed suit on June 28, 2013. According to Dreamstreet, the earliest date on which it could have discovered or been expected to discover MidCountry's alleged fraud was December 10, 2009 – within the four-year limitations period – when Ingraham received the certificate of compliance on his home. It was not until then, Dreamstreet argues, that MidCountry was required to make good on the Agreement by releasing the holdback to Dreamstreet, and thus not until then that Dreamstreet could have known that MidCountry did not intend to honor the Agreement.

What that position fails to account for is the undisputed fact that on June 16, 2009 – approximately two weeks outside the four-year limitations period – Dreamstreet itself announced that it planned to sue MidCountry on the same theory it advances in this litigation: that the seller holdback was a sham. In its June 16 email, Dreamstreet explained that the extensive

_____

(N.C. Ct. App. 1989) overruled on other grounds by Crossman v. Moore, 459 S.E.2d 715 (N.C. 1995). Like the district court, we disagree. In both its complaint and its brief before this court, Dreamstreet makes clear that its claim "is based on deceptive statements made by MidCountry" in order to induce Dreamstreet to enter into a "sham seller holdback scheme." Appellant Br. at 22; see also J.A. 437 (district court explaining that "all the conduct the plaintiff is contending constitutes the [UDTPA violation] occurred back in 2008, in the inducement to enter into" the Agreement).

9

documents it had shared with its attorney – "all emails from [MidCountry] during the initial closing, along with my note, deed of trust, and a budget spreadsheet from [MidCountry] regarding Carl Ingraham's house budget" – were enough to convince both Dreamstreet and its counsel that the holdback funds were not intended for Ingraham's construction budget and "never should have been held back in the first place." J.A. 86.

By June 16, 2009, in other words, Dreamstreet and its attorney were privy to information that led it to accuse MidCountry of fraud and threaten to "get a judge . . . to force the release of those funds." Id. Dreamstreet cannot now claim that it lacked "capacity and opportunity to discover" that fraud, Grubb Props., Inc. v. Simms Inv. Co., 400 S.E.2d 85, 88 (N.C. Ct. App. 1991), until six months later, when Ingraham received a certificate of compliance. The limitations period on Dreamstreet's UDTPA claim began running by June 16, 2009, see, e.g., Newton v. Barth, 788 S.E.2d 653, 662 (N.C. Ct. App. 2016) (UDTPA claim triggered when party discovers or should discover facts constituting alleged fraud), more than four years before Dreamstreet filed suit. With respect to the UDTPA claim, the district court properly granted summary judgment to MidCountry on statute of limitation grounds.

**B.**

We turn next to Dreamstreet's constructive fraud claim, on which the district court also granted summary judgment to MidCountry. Under North Carolina law, the key to a constructive fraud claim is a fiduciary relationship between plaintiff and defendant. It is that relationship of "special confidence" that gives rise to a special duty to "act in good faith and with due regard to the interests of the one reposing confidence." Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) (internal quotation marks and citation omitted). When such a fiduciary relationship exists – and only when it exists – a plaintiff need not bear the "exacting" burden of proving actual fraud, but may instead rely on a presumption of constructive fraud that arises under equity "when the superior party obtains a possible benefit." Cash v. State Farm Mut. Auto. Ins. Co., 528 S.E.2d 372, 380 (N.C. Ct. App. 2000); see also White v. Consol. Planning, Inc., 603 S.E.2d 147, 156 (N.C. Ct. App. 2004) (constructive fraud plaintiff need not prove intent to deceive).

MidCountry argues that Dreamstreet cannot show such a relationship in this case, and we agree. Under North Carolina law, fiduciary relationships are characterized by "confidence reposed on one side, and resulting domination and influence on the other." Dallaire v. Bank of America, N.A., 760 S.E.2d 263,

11

266 (N.C. 2014) (internal quotation marks and citation omitted). Lawyers and their clients, for instance, or trustees and their beneficiaries, share such relationships, with a "heightened level of trust" matched with a corresponding duty to "maintain complete loyalty." Id. By contrast, parties to a contract – like the Agreement between MidCountry and Dreamstreet – generally do not become each other's fiduciaries; what they owe each other is defined by the terms of their contracts, with no special duty of loyalty. Branch Banking, 418 S.E.2d at 699; see also Dallaire, 760 S.E.2d at 267 (borrowers and lenders, unlike fiduciaries, "are generally bound only by the terms of their contract and the Uniform Commercial Code"). As a matter of law, there can be no fiduciary relationship between "parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." Strickland v. Lawrence, 627 S.E.2d 301, 306 (N.C. Ct. App. 2006).

On the record in this case, it is clear that the relationship between MidCountry and Dreamstreet was no more than the standard one between two commercial entities negotiating a contract at arm's length. There is nothing to suggest that Dreamstreet "reposed any sort of special confidence," Branch Banking, 418 S.E.2d at 699, in MidCountry; on the contrary, skeptical of MidCountry's proposal, Pittman consulted with an attorney, a banker, and a real estate appraiser about the

12

holdback before closing on the sale of the lot. Such consultation with outside experts, North Carolina courts have held, is inconsistent with a claim of fiduciary relationship or constructive fraud. See id. (no fiduciary relationship where complaining party consulted with banker and accountant before entering into agreement); see also Sullivan v. Mebane Packaging Grp., Inc., 581 S.E.2d 452, 462 (N.C. Ct. App. 2003) (evidence that complaining party obtained outside counsel rebuts presumption of constructive fraud).

Nor is there any indication that Dreamstreet was in the kind of unequal bargaining position that might qualify as an indication of a fiduciary relationship under North Carolina law. Dreamstreet emphasizes that it was MidCountry that devised the holdback arrangement and then proposed it to Dreamstreet. But the fact that one party proposes or advocates for a transaction is not enough to establish unequal bargaining power and a fiduciary relationship. North Carolina law makes clear, for instance, that borrowers ordinarily do not enjoy a fiduciary relationship or the protection of a special duty of loyalty when it comes to their lenders, even when those lenders encourage them to borrow. See Dallaire, 760 S.E.2d at 266-67 (assurances by bank lender regarding mortgage loan do not turn ordinary debtor-creditor relationship into fiduciary relationship); Branch Banking, 418 S.E.2d at 699 (reliance on representations

13

of creditor does not turn debtor-creditor relationship into fiduciary relationship). Dreamstreet was in a position to consult with an attorney before agreeing to MidCountry's terms. If Dreamstreet had concerns, then it could have declined the holdback proposal and forgone the sale of its lot – or it could take steps to protect itself, as it did, by insisting on a promissory note with Ingraham, secured by a deed of trust.

We do not doubt, as Dreamstreet argues, that a fiduciary relationship does not depend in every case on the existence of a formal legal relationship like that between attorney and client or trustee and beneficiary. See Bumgarner v. Tomblin, 306 S.E.2d 178, 183 (N.C. Ct. App. 1983) (finding issue of fact as to fiduciary relationship where plaintiffs had long-term and regular dealings with defendant with special legal skills and real estate expertise). But it is clear that more is required than a "mutually interdependent" business relationship between two parties to a commercial contract. Strickland, 627 S.E.2d at 306; see Branch Banking, 418 S.E.2d at 699. The undisputed facts of this case reveal an ordinary contractual relationship, with nothing that could give rise to a special fiduciary relationship. And because the existence of a fiduciary relationship is a necessary element of constructive fraud, the

district court properly granted summary judgment to MidCountry on this claim, as well.[5]

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[5] As noted above, the district court assumed the existence of a fiduciary relationship for purposes of its decision, and granted summary judgment on the ground that Dreamstreet could show no breach of any fiduciary duty it was owed. See Governors Club, Inc. v. Governors Club Ltd. P'ship, 567 S.E.2d 781, 787–88 (N.C. Ct. App. 2002) (constructive fraud plaintiff must show existence of fiduciary duty and breach of that duty). Because we hold that Dreamstreet cannot show the necessary fiduciary relationship as a matter of law, we need not address the district court's alternative holding.