**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1254**

VIRGINIA ELECTRIC AND POWER COMPANY, d/b/a Dominion Virginia Power,

> Plaintiff - Appellee,

v.

BRANSEN ENERGY, INC., f/k/a Bransen Energy, LLC,

> Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge; James R. Spencer, Senior District Judge. (3:14-cv-00538-JAG)

Argued: January 25, 2017                                        Decided: March 9, 2017

Before GREGORY, Chief Judge, and THACKER and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

**ARGUED:** Sam Preston Burchett, SAM P. BURCHETT ATTORNEY AT LAW, Lexington, Kentucky, for Appellant. Benjamin L. Hatch, MCGUIREWOODS LLP, Norfolk, Virginia, for Appellee. **ON BRIEF:** E. Duncan Getchell, Jr., J. William Boland, Ryan D. Frei, Katherine Mims Crocker, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee.

THACKER, Circuit Judge:

Seeking fuel for a newly constructed power plant, Virginia Electric and Power Company, doing business as Dominion Virginia Power ("Dominion"), contracted with Bransen Energy, Inc. ("Bransen"), and paid nearly $27 million for coal product which would satisfy rigid specifications and environmental regulations. However, the product Bransen delivered, consisting of coke breeze and waste coal, fell far short of these requirements. After Dominion filed suit in the United States District Court for the Eastern District of Virginia, the district court awarded Dominion partial summary judgment on claims related to Bransen's delivery of coke breeze, and then held for Dominion after a bench trial on its claims related to the delivery of waste coal. In total, the district court awarded over $22 million in damages. Bransen filed this appeal, arguing that the district court erred by ruling in favor of Dominion as to both liability and damages. Finding no error, we affirm for the reasons that follow.

I.

A.

In June 2008, Dominion began constructing the Virginia City Hybrid Energy Center (the "Plant") in Wise County, Virginia. The Plant is "a 600-megawatt, clean-coal powered electrical generation facility." J.A. 3960.[1] The commissioning process for a

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

new power plant includes a "testing phase" to assure compliance with regulatory standards. In November 2011, Dominion began the testing phase.

Three years earlier, in 2008, Dominion began soliciting suppliers of performance fuel, a high-quality coal product, for the testing phase. As an industry standard, power plants use performance fuel to test equipment and determine operating capacity because of the quality and consistency of the fuel, which is higher than the quality of fuel a plant uses post-commissioning. Dominion sought performance fuel that would be acceptable directly at the Plant without further processing and would comply with environmental permits acquired from the Virginia Department of Environmental Quality. Ultimately, Bransen contracted with Dominion to supply about half of the expected performance fuel necessary for testing, totaling 600,000 tons of coal product for nearly $27 million. The testing phase lasted around eight months, and the Plant was commissioned and began commercial operations as planned on July 10, 2012 (the "commercial operations date" or "COD").

1.

Before the Plant's commissioning, the parties entered three contracts relating to the testing phase: (1) the Master Coal Purchase and Sale Agreement (the "Master Agreement"); (2) the Confirmation for the Purchase of Performance Fuel (the "Pre-COD Confirmation");[2] and (3) the Coal Services Agreement (the "Services Agreement"). The

---

[2] As discussed more fully below, the Pre-COD Confirmation required Bransen to deliver Run-of-Mine coal for Dominion's use as performance fuel during the testing phase.

parties entered into two additional agreements for the purchase of up to three million tons of "waste coal" for a term beginning on the commercial operations date (the "Post-COD Confirmations").[3] Dominion also entered a Land Lease Agreement (the "Lease") with Coal Technology International, LLC ("CTI"), to lease property on which Dominion would store and blend coal purchased from Bransen before delivery to the Plant.

a.

The Master Agreement, dated November 8, 2010, governed all subsequent dealings between the parties. It required the parties to enter transactions regarding the sale and purchase of coal by way of written Confirmation -- a separate contract between the parties pursuant to the Master Agreement. If such Confirmation is inconsistent with the Master Agreement, the Confirmation prevails over the Master Agreement unless the Master Agreement otherwise provides.

b.

The Pre-COD Confirmation, dated January 26, 2011, required Bransen to provide between 450,000 and 600,000 tons of "Run-of-Mine Coal," of which Dominion was required to buy at least 450,000 tons with an option to purchase an additional 150,000 tons. In the Pre-COD Confirmation, Dominion clarified that it would only accept Run-of-Mine coal by placing an "X" over a line next to a paragraph defining Run-of-Mine

---

[3] Unlike the Pre-COD Confirmations, the Post-COD Confirmations did not include minimum purchase amounts. Compare J.A. 463 (requiring Bransen to "deliver between 450,000 – 600,000 Tons of Product" and Dominion "to purchase a minimum of 450,000 Tons of Product"), with id. at 998 (requiring Bransen "to deliver 1,500,000 Tons of Product" and Dominion to "submit a weekly order") and id. at 1011 (same).

coal. By contrast, two other products and their definitions -- "Coal" and "Waste Coal" -- appear, respectively, above and below the paragraph for Run-of-Mine coal. There was no "X" marked next to either of those product descriptions.

The Pre-COD Confirmation defines Run-of-Mine coal as conforming to specifications provided in another section of the Pre-COD Confirmation, and it required the coal to be "substantially consistent in quality throughout a Shipment," and to have "no intermediate sizes (including fines) added or removed," but it allowed "limited amounts of extraneous material." J.A. 462. The specifications referenced in this definition, entitled "Performance Fuel Specifications," establish rejection limits for criteria such as the Btu[4] measurement, moisture rate, and sulfur and ash composition. Given "the different technology of the [Plant's] boilers . . . and stringent environmental limits," the Pre-COD Confirmation also allowed Dominion to suspend deliveries if the coal "adversely affect[ed] operation" of the Plant within two years of the commercial operations date. Id. at 466.

c.

Dominion entered the Lease as well as the Services Agreement on the same date as the Pre-COD Confirmation. Though Bransen was not a party to the Lease, the opening recital of the Lease acknowledges the Pre- and Post-COD Confirmations along with the Services Agreement. Indeed, the Lease would terminate upon the termination of the

---

[4] A "British thermal unit" measures "[t]he quantity of heat required to raise the temperature of one pound of water by one degree Fahrenheit." Webster's II New Riverside University Dictionary (1988).

5

Services Agreement or any Confirmation then in effect, either before or after commissioning. The Services Agreement assigned Bransen a host of duties related to the transportation, management, regulation, and testing of the coal held at the CTI property, including analyzing the coal to ensure compliance with the performance fuel specifications, which were identical to those in the Pre-COD Confirmation.

d.

The agreements limit relief available in the case of either party's breach. The Master Agreement allows a nondefaulting party to terminate the Master Agreement and all other transactions between the parties "[u]pon the occurrence and during the continuance of an Event of Default." J.A. 147. Events of Default include,

> the failure of the Defaulting Party to comply with any material obligation under a Transaction covered by this Master Agreement ( . . . <u>except for Seller's obligations to deliver Coal pursuant to the Specifications contained in a Confirmation, the exclusive remedy for which is provided in Sections 5.1, 5.2 and 5.3</u>) and such failure continues uncured for three (3) Business Days after written notice thereof . . . .

J.A. 145–46 (emphasis supplied). Section 5 thus provides three exclusive remedies for product delivered pursuant to a Confirmation that does not conform to the specifications in that Confirmation.

Section 5.1 allows for "quality adjustments" for nonconforming product, resulting in price modifications calculated pursuant to formulae provided in an exhibit to the Agreement. J.A. 140. Alternatively, Section 5.2 provides Dominion "Rejection Rights," which allow either rejecting a shipment or "reaching a mutually acceptable price adjustment or other arrangement with" Bransen, if an independent third-party analyst

6

determines that the shipment does not conform to specifications. Id. As yet further recourse, Section 5.3 provides "Suspension Rights" pursuant to which Dominion may "suspend the receipt of future shipments" after receiving multiple nonconforming shipments without rejecting them. Id. at 140–41. For breach of any provision for which the Master Agreement does not provide an express remedy, the Master Agreement limits recoverable damages "to direct actual damages," excluding "consequential, incidental, punitive, exemplary or indirect damages, lost profits, or other business interruption damages." Id. at 150–51 (capitalization removed).

2.

a.

From February through December 2011, Bransen billed Dominion for, and delivered to the CTI property, 599,920.34 tons of material.[5] Bransen included in this amount, however, 43,000 tons of coke breeze, "a non-coal industrial byproduct" that was not an approved fuel source "and did not qualify as performance fuel." J.A. 1827. And Dominion had not acquired environmental permits to use coke breeze as fuel. Coke is not coal. Rather, according to the American Society for Testing and Materials, it is "a carbonaceous solid produced from coal, petroleum, or other materials by thermal decomposition with passage through a plastic state." Id. at 1717. Coke breeze consists of "the fine screenings from crushed coke or from coke as taken from [coke] ovens." Id.

---

[5] Bransen charged Dominion for a slightly lower amount of material than it actually delivered, which totaled 601,359.54 tons.

Bransen pursued coke breeze suppliers before executing the Pre-COD Confirmation and accepted coke breeze shipments after executing the Pre-COD Confirmation. The shipping notices and summaries Bransen provided Dominion regarding the Pre-COD Confirmation deliveries described the material delivered as "coal," but Bransen included the total amount of coke breeze in its invoices without disclosing that fact to Dominion. J.A. 1111; see id. at 1257. Dominion provided full payment for these invoices, which totaled $26,724,750.17. A May 2011 email from Michael Peters, the President of Bransen Energies, indicates that he ceased buying coke breeze around that time because he was "a lil [sic] nervous about [Dominion] not approving." Id. at 1260.

The impurities in Bransen's deliveries were not limited to amounts of coke breeze. At trial, Peters conceded that aside from the coke breeze, the product he delivered was "garbage of bituminous" or "GOB" coal. J.A. 2577. Indeed, Peters stated that he referred to the type of coal delivered pursuant to the Pre-COD Confirmation "as GOB, it is garbage of bituminous." Id. at 2574–75. And although Peters maintained that GOB coal is synonymous with Run-of-Mine coal, another one of Bransen's former employees who had worked in the coal industry for over 40 years admitted that GOB is synonymous with "waste coal," id. at 2667, and expert testimony established that Run-of-Mine coal is categorically distinct from GOB coal. Specifically, whereas Run-of-Mine coal is "freshly-mined," GOB coal is the "waste" or "refuse" remaining after removing clean coal from the product. Id. at 2678.

8

b.

In December 2011, Dominion received a letter from an anonymous tipster indicating that subpar product had been surreptitiously delivered to the CTI property. Dominion thus began investigating the allegation, leading to an interview with Peters. A summary of the interview, which Peters signed and verified as "true and correct to the best of [his] knowledge," states that the CTI property had "a very unsuitable, wet surface," which Peters claimed required a base layer before using it for coal storage. J.A. 1256, 1258. Peters claimed that he therefore purchased 43,000 tons of coke breeze on which he stored around sixty percent of the stockpile. He admitted, however, that Dominion had no knowledge of the coke breeze and he "accept[ed] full responsibility for having improperly charged [Dominion] for the coke breeze." Id. at 1257.

As a result, in January 2012, Dominion hired an independent laboratory, SGS North America ("SGS"), to analyze the product and determine whether it was suitable performance fuel despite its impurities. The SGS reports showed that the moisture content and Btu value of the delivered product exceeded contractual rejection limits.[6] Additionally, in April 2012, Bransen assembled three samples of product which Bransen represented to be free of coke breeze, but further testing revealed that the samples also

---

[6] The moisture rejection limit in the Services Agreement and Pre-COD Confirmation was 9.0%; the SGS analysis measured as-received moisture at 11.56% and 11.51%. The upward Btu rejection limit in both contracts was 8200; the SGS analysis measured as-received Btu at 8453 and 8121, and dry-product Btu as 9557 and 9178.

contained trace amounts of coke breeze and produced size, moisture, and Btu measurements exceeding rejection limits.[7]

C.

1.

In light of the discovery of this subpar product, Dominion deemed the shipments unacceptable and did not deliver them to the Plant for Pre-COD use. In early 2012, when the parties' relationship began to deteriorate due to disputes over how to deal with Bransen's product, Bransen attempted to resolve the issue by proposing to replace the entire amount of coke breeze, buy back the product for which Dominion paid, or replace the product with material from a pre-approved source. Dominion rejected these proposals, however, because they depended on further contingencies, potentially delayed commissioning beyond the projected commercial operations date, and required continuing relations with Bransen, whom Dominion no longer trusted.

During the first half of 2012, with the commercial operations date approaching, Dominion sought and obtained performance fuel from alternative sources. In the spring of 2012, still seeking to use coke breeze as fuel in order to salvage some value out of the product Bransen delivered, Dominion contacted the Virginia Department of

---

[7] The SGS reports revealed as-received moisture measurements of 11.93%, 10.61%, and 9.58%. As-received Btu measurements were 8279, 8269, and 8188; dry-product Btu measurements were 9400, 9251, and 9055. The Services Agreement required size measurements to be "less than 10.0% below 100 mesh," J.A. 829, and the Pre-COD Confirmation allowed rejection if sizing was over 10% "passing 100 mesh," id. at 465. Measurements for two of the piles revealed 31.2% and 25.5% passing 100 mesh.

10

Environmental Quality. The Department of Environmental Quality determined, however, that Dominion could not use coke breeze as fuel without modifying its existing permits. Dominion thereafter applied for and obtained modifications to its air permits and waste permits in October 2012 and November 2012, respectively. The air permits required $14,000 in application fees.

Endeavoring further to recover some utility out of Bransen's product, Dominion also pursued methods of cleaning the product and blending it with higher quality material in an effort to render it suitable for post-commissioning use. Dominion engaged Harold Keen Service Co., LLC, to manage this process on the CTI property. But this proved problematic. The stockpile would not be depleted for eight to ten years, while the CTI lease was for a much shorter period and did not guarantee extension. Dominion therefore sought to clean and blend the product in nearby preparation plants with a target completion date of December 31, 2015.

2.

On June 22, 2013, Dominion's counsel sent Bransen's counsel a letter ordering Bransen to cease and desist accessing or delivering coal material on the CTI property. Dominion claimed it could not affirmatively terminate the contracts between the parties earlier than 2013 because early termination of the Master Agreement or any Confirmation would also terminate the Lease pursuant to its own terms, meaning Dominion could thereby abandon any product for which Dominion paid and stored on the property. To avoid this potential loss, on June 24, 2013, Dominion and CTI entered into two amended leases at increased rental prices for subsequent terms ending on June 30, 2015.

11

A year later, in June 2014, Bransen sent Dominion a letter demanding that Dominion allow Bransen's performance pursuant to the Post-COD Confirmations. Specifically, Bransen interpreted the Post-COD Confirmations as requiring Dominion to order coal product from Bransen after commissioning; Bransen therefore demanded that Dominion continue to order and accept deliveries from Dominion. The following month, Dominion's counsel provided formal notice of Bransen's alleged breach of the Master Agreement, Pre-COD Confirmation, Post-COD Confirmations, and Services Agreement. The alleged breaches revolved around Bransen's delivery and concealment of, and billing Dominion for, quantities of coke breeze that contaminated the stockpile. When cure periods for those contracts expired without response from Bransen, Dominion notified Bransen that it was terminating the contracts between the parties.

D.

On September 10, 2014, Dominion filed the operative complaint, alleging Bransen breached the contracts it entered with Dominion, and seeking over $15 million in damages. Bransen answered and counterclaimed, asserting an affirmative defense of waiver for Dominion's alleged failure to utilize the remedies specified in the contracts, and counterclaims for breach of contract and breach of the covenant of good faith and fair dealing. The case progressed in two phases: the first considered cross-motions for partial summary judgment for the amount of product consisting of coke breeze; the second, which proceeded to trial, considered the remaining amount of product consisting of GOB coal.

1.

Dominion moved for partial summary judgment on its contract claim for Bransen's delivery of coke breeze and against Bransen's counterclaims. Bransen also moved for partial summary judgment, arguing that it provided adequate assurance of performance by offering to replace the coke breeze shipments, and that Dominion accepted the deliveries, failed to timely reject or revoke its acceptance pursuant to the Virginia analog of the Uniform Commercial Code ("UCC"), and breached the Post-COD Confirmations by refusing to order three million tons of waste coal.

The district court granted Dominion's motion, holding, "coke breeze is not Run-of-Mine coal and therefore could not have met the specifications in the Pre-COD Confirmation." J.A. 2319. The district court also rejected Bransen's counterclaims, holding that the first-material breach doctrine barred those claims and that the contracts between the parties departed from UCC acceptance and rejection provisions, thereby validating Dominion's post-testing rejection. The court further held that Bransen's proposed resolutions "were not commercially reasonable," and that Dominion complied with applicable termination procedures while Bransen "made no attempt to cure during the time it was contractually allotted" though Bransen's ability to cure may have been questionable. Id. at 2322–23. The court thus awarded Dominion $1,957,325 in "direct damages" flowing from the delivery of coke breeze, consisting of the amount Bransen charged Dominion for the coke breeze plus the environmental application fees associated with using coke breeze as fuel.

13

2.

The parties proceeded to a bench trial on Dominion's remaining contract claim, alleging that the remaining coal that did not contain coke breeze nevertheless failed to satisfy contractual standards. The district court held Bransen liable on this claim, crediting expert testimony that the GOB coal Bransen delivered to Dominion was waste coal and thus not the Run-of-Mine coal for which Dominion contracted.[8] Stemming from this breach, the court reasoned Dominion was entitled to damages for expenses incurred in processing, improving, and storing the GOB coal, and for purchasing replacement coal from other suppliers. Relying on Dominion's expert report, the court calculated total damages of $22,894,013, and awarded these damages to Dominion less the previous award of $1,957,325, amounting to an award of $20,936,688 for the noncompliant coal.

II.

Summary judgment is subject to de novo review and appropriate if "no material facts are disputed and the moving party is entitled to judgment as a matter of law." Dreamstreet Invs., Inc. v. MidCountry Bank, 842 F.3d 825, 829 (4th Cir. 2016). Judgment after a bench trial is subject to a mixed standard of review, pursuant to which we review legal conclusions de novo and factual findings for clear error. Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections, 827 F.3d 333, 340 (4th Cir. 2016). An

---

[8] The expert testimony distinguished GOB coal from Run-of-Mine coal, providing, "Run-of-[M]ine coal is the freshly-mined coal," and after "separat[ing] the good coal out of it," the remaining product is GOB coal. J.A. 2678. Thus, the expert opined, "GOB coal would be in that category of waste coal," or "refuse," but it "is not [R]un-of-[M]ine coal." Id. at 2681.

14

error is clear if we have a "definite and firm conviction" that the district court was mistaken. Andrews v. Am.'s Living Ctrs., LLC, 827 F.3d 306, 312 (4th Cir. 2016) (quoting Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 909 (4th Cir. 1989)).

## III.

The contracts provide, and the parties do not dispute, that Virginia law governs this case. In Virginia, if parties have entered into multiple documents relating to a business transaction, a court must construe the documents "together to determine the parties' intent." First Am. Bank of Va. v. J.S.C. Concrete Const., Inc., 523 S.E.2d 496, 500 (Va. 2000) (quoting Doswell Ltd. P'ship v. Va. Elec. and Power Co., 468 S.E.2d 84, 88 (Va. 1996)). "In ascertaining the parties' intent, we consider the plain meaning of the language the parties used in the documents." Musselman v. Glass Works, L.L.C., 533 S.E.2d 919, 921 (Va. 2000). "Consequently, if such contractual language is unambiguous," a court "does not apply rules of construction or interpretation" but "simply give[s] the language its plain meaning." Seoane v. Drug Emporium, Inc., 457 S.E.2d 93, 96 (Va. 1995).

## A.

"[T]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Navar, Inc. v. Fed. Bus. Council, 784 S.E.2d 296, 299 (Va. 2016) (alteration in original) (quoting Ulloa v. QSP, Inc., 624 S.E.2d 43, 48 (Va. 2006)). Bransen does not contest the

15

enforceability of the agreements between the parties; the following section therefore addresses the latter two elements.

1.

"[A] party who commits the first breach of contract," if material, "is not entitled to enforce the contract" and thereby excuses the nonbreaching party from performance. Horton v. Horton, 487 S.E.2d 200, 203–04 (Va. 1997). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Id. at 204.

As an initial matter, Bransen argues Dominion was the first breaching party by deciding as early as 2011 to cease doing business with Bransen and accordingly refusing to purchase coal from Bransen "through 2017 pursuant to the two Post-COD Confirmations." Appellant's Br. 43. Even if Dominion decided against further business with Bransen at that time, however, that decision would not violate the Post-COD Confirmations. Those Confirmations only obligate Bransen "to deliver 1,500,000 Tons of Product over the Term" of the contract depending on Dominion's "weekly order" amounts. J.A. 998, 1011. This provision therefore granted Dominion an option -- not a requirement -- to purchase coal from Bransen after commissioning.

The "essential purpose" of the agreements between the parties, Horton, 487 S.E.2d at 204, was to provide Dominion with coal that would be acceptable performance fuel to test the Plant's operating capacity and comply with environmental regulations. Therefore, as the court held, Bransen's delivery of coke breeze and subpar coal was the first material breach of the Master Agreement, Pre-COD Confirmations, and Services

16

Agreement. Bransen defeated the essential purpose of the agreements by delivering a mixture of coke breeze and GOB coal, neither of which were Run-of-Mine coal nor, as testing established, satisfied contractual quality standards.

Moreover, the hoops through which Dominion has had to jump to bring about any utility to Dominion's product underscore the materiality of Bransen's breach. Indeed, Bransen's subpar product required extensive testing, which proved time consuming and costly. And the consequent findings required Dominion to obtain modifications to its environmental permits at no small cost, along with locating alternative suppliers and hiring coal processors to salvage Bransen's product.

a.

Bransen argues that because the coke breeze made up only around seven percent of its total shipment, its delivery of coke breeze was not a material breach. But this argument rests on an essential misunderstanding of the procedural history and the characteristics of the coal separated from the coke breeze. The district court did not render judgment on a claim involving Dominion's aggregate shipment; instead, the district court held at summary judgment that the delivery of approximately 43,000 tons of coke breeze violated the contract because, put simply, "coke breeze is not Run-of-Mine Coal." J.A. 2319.

In an apparent attempt to create a triable issue of fact contrary to the district court's summary judgment ruling, Bransen points to deposition testimony of one of Dominion's employees, Edward Roarty, who concedes that the coke breeze met the specifications for sulfur and moisture. See Appellant's Br. 23 (citing J.A. 312–13). But

17

in the same breath, Bransen acknowledges that Roarty also recognized that the coke breeze "was above the reject limit on BTU." J.A. 312. Moreover, even if the coke breeze satisfied sulfur and moisture requirements, it would not refute the simple fact that coke breeze is not coal.

b.

In any event, the district court's verdict against Bransen involved a separate issue: whether the remaining coal product, separate from the coke breeze, satisfied the contract specifications.[9] The district court based its finding that GOB coal is not Run-of-Mine coal by crediting expert testimony to that effect. Specifically, the testimony demonstrated that GOB coal is "waste coal" or "refuse," which "is not [R]un-of-[M]ine coal." J.A. 2681. Given that Bransen's only contrary evidence was nonexpert testimony of Bransen's current or former employees, we cannot say that this finding was clearly erroneous. See Raleigh Wake Citizens Ass'n, 827 F.3d at 340; cf. United States v. Wooden, 693 F.3d 440, 452 (4th Cir. 2012) (overturning factual finding in face of conflicting expert testimony but cautioning courts reviewing for clear error to be reluctant to do so). And even aside from the categorical distinction between GOB and Run-of-Mine coal, those amounts of coal purportedly separated from the coke breeze still

---

[9] Indeed, Bransen's opening brief indicates its misunderstanding of the procedural posture by referring to the bench trial as a "damages hearing" and failing to acknowledge the court's liability finding. See, e.g., Appellant's Br. 46 ("The lower Court, after a two-day hearing on [Dominion's] damages arising from the Opinion and Order One ruling that Bransen had materially breached the Master Agreement, the Pre-COD Confirmation and the [Services Agreement], . . . awarded in excess of $22 million in damages . . . .").

contained trace amounts of coke breeze and failed to satisfy the specifications to which the parties agreed.

Bransen also argues that because Dominion processed the coal product in order to use it after commissioning, Dominion cannot claim a material breach of the contracts between the parties. But this argument conflates the materiality of Bransen's breach with Dominion's response to Bransen's breach. More importantly, the central purpose of the contract was to provide Dominion with fuel for use before commissioning the Plant, not after, so any use of the product after commissioning only underscores the materiality of Bransen's breach.

2.

On the element of damages, Bransen's sole argument is that Dominion's damages expert failed to establish any damages stemming from Bransen's breach of the Services Agreement. This argument is conclusory at best and misleading at worst. Bransen fails to explain how its failure to ensure compliance with performance fuel specifications, identical to those in the Pre-COD Confirmation and required pursuant to the Services Agreement, did not produce Dominion's damages. And Bransen omits that when asked about damages stemming from the Services Agreement, Dominion's damages expert declined to opine on whether his damages calculation stemmed from a breach of the Services Agreement but recognized the Services Agreement as relevant to his analysis because it required processing that effected costs associated with storing and testing the coal product.

Thus, Bransen is liable for delivering product consisting of coke breeze and GOB coal, neither of which satisfied the contracts between the parties. The following section therefore assesses the remedies available for this breach and, in turn, the propriety of the district court's damages award.

B.

A contractual remedy is "exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive." Bender-Miller Co. v. Thomwood Farms, Inc., 179 S.E.2d 636, 638 (Va. 1971). Here, the Master Agreement provides, "the exclusive remedy" for "Seller's obligations to deliver Coal pursuant to the Specifications contained in a Confirmation" are quality adjustment, rejection, and suspension rights pursuant to Section 5 of the Master Agreement. J.A. 145–46 (emphasis supplied). Indeed, Bransen conceded as much at oral argument by arguing that Section 5 provides the "exclusive remedy" for Dominion's coke-breeze claim because coke breeze "met all the specifications." Oral Argument at 5:45–7:27, Va. Elec. and Power Co. v. Bransen Energy, Inc., No. 16–1254 (4th Cir. Jan. 25, 2017). Section 5 does not limit the remedies available to Dominion, however, which does not base its claims only on Bransen's failure to conform to Confirmation specifications but, instead, Bransen's failure to deliver the product for which Dominion contracted and paid.

Indeed, the Pre-COD Confirmation contains a section titled, "Product," which defines "Coal," "Run-of-Mine Coal," and "Waste Coal,"[10] and yet another section

---

[10] These provisions read as follows:

(Continued)

20

reserved for "Performance Fuel Specifications," which provides rejection limits for Btu,

moisture, sulfur and ash measurements, and stipulates that if any shipment triggers any of

> Coal: means any and all of the Coal to be sold by Seller and purchased by Buyer, the quality of which conforms to the Specifications and which does not trigger Buyer's rejection rights under Section 5.2, or is otherwise accepted by Buyer under this Master Agreement or any Transaction, and which contains no synthetic fuels, is substantially free from any extraneous materials (including, but not limited to mining debris, bone, slate, iron, steel, petroleum coke, earth, rock, pyrite, wood or blasting wire), is substantially consistent in quality throughout a Shipment, meets the size required, and has had no intermediate sizes (including fines) added or removed.

> Run-of-Mine Coal: Defined as any and all of the coal to be sold by Seller and purchased by buyer, the quality of which conforms to the Specifications set forth herein and which does not trigger Buyer's rejection rights and which may contain limited amounts of extraneous material, is substantially consistent in quality throughout a Shipment, and has had no intermediate sizes (including fines) added or removed. For clarification, any coal product that does not meet the definition of Coal or Waste Coal shall be deemed Run-of-Mine Coal.

> Waste Coal: Defined as any and all of the coal waste material to be sold by Seller and purchased by Buyer, the quality of which conforms to the Specifications set forth herein and which does not trigger Buyer's rejection rights and which may contain significant amounts of extraneous material, is substantially consistent in quality throughout a Shipment, has had no intermediate sizes (including fines) added or removed, and complies with the two stipulations below. Prior to the first delivery of Waste Coal from a Source, Seller must: 1) provide Buyer with a fully executed State approved reclamation plan for that source [for example, in Virginia the document would be the Virginia Department of Mines, Minerals, and Energy ("DMME") reclamation plan agreement], and 2) sign the Waste Coal Certification contained below.

J.A. 462–63.

those rejection limits, "the provisions of Article 5.2 shall apply." J.A. 462–65. Thus, considering the plain meaning of these provisions, we cannot extend "specifications" to include "products." See Musselman, 533 S.E.2d at 921–22 ("We will not, by construction, insert a term in a contract that the parties to the contract omitted."). Indeed, at oral argument, Bransen's counsel so much as conceded this interpretation: when asked which provision would apply to remedies assuming Bransen was liable for breach, counsel stated, "We both disclaim lost profits . . . as well as consequential or incidental damages," invoking the limitations in Section 8.8 rather than Section 5.[11] Oral Argument at 14:40, Va. Elec. and Power Co. v. Bransen Energy, Inc., No. 16–1254 (4th Cir. Jan. 25, 2017).

Section 8.8, which limits damages to "direct actual damages" where the Master Agreement does not provide an express remedy, J.A. 151 (capitalization removed), is therefore the only restriction on Dominion's available remedies. "Direct damages are those which flow naturally or ordinarily from the contract breach." Long v. Abbruzzetti, 487 S.E.2d 217, 219 (Va. 1997). "The measure of direct damages is the cost to complete the contract according to its terms, or . . . the cost of repair to meet the contract terms." TransDulles Ctr., Inc. v. USC Corp., 976 F.2d 219, 226 (4th Cir. 1992) (citing Lochaven

---

[11] Compare J.A. 150–51 (limiting remedies for breach of any provision for which Master Agreement does not provide express remedy or measure of damages to "direct actual damages" (capitalization removed)), with id. at 145–46 (providing that "exclusive remedy" for Bransen's failure "to deliver Coal pursuant to the Specifications contained in a Confirmation" are "provided in Sections 5.1, 5.2, and 5.3") and id. at 140–41 (detailing Sections "5.1 Quality Adjustments," "5.2 Buyer's Rejection Rights," and "5.3 Suspension Rights," none of which allow damages).

Co. v. Master Pools by Schertle, Inc., 357 S.E.2d 534, 538 (Va. 1987)). Thus, the purpose of direct "damages for breach of contract is to place the injured party in the position he would have occupied had the defendant performed." Id. (citing Barr v. MacGlothlin, 11 S.E.2d 617, 621 (Va. 1940)).

Based on Dominion's expert report on damages, Bransen argues the district court awarded damages, including indirect damages, in violation of Section 8.8. Further, Bransen challenges the calculation of the damages award, arguing it includes damages for a claim Dominion did not pursue at trial. These arguments fail.

First, Bransen asserts, without citing to the record, that the district court awarded "lost profits of $9,959,447 in the form of depreciation in value of the Coal Stockpile." Appellant's Br. 48. Aside from lacking a basis in the record, this conclusory argument suffers from another fundamental flaw: any damages awarded for the depreciated value of the product Bransen delivered would not amount to lost profits because Dominion did not intend to resell it, nor did this diminution in value estimate the Plant's decreased success as a result of Bransen's breach. Cf. Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 732 S.E.2d 676, 685–86 (Va. 2012) (upholding lost-profits award based on recorded profits of comparable companies); Banks v. Mario Indus. of Va., Inc., 650 S.E.2d 687, 696 (Va. 2007) (requiring plaintiff seeking lost profits to prove "diminution in value of the business by reason of the wrongful act, measured by the loss of the usual profits from the business" (citation omitted)). Instead, these would simply amount to damages flowing directly from Bransen's breach for the cost of putting Dominion in the

23

position it would have been had Bransen performed.  See TransDulles Ctr., Inc., 976 F.2d at 226.

Second, Bransen argues that processing costs Dominion expended to render the coal product suitable for use at the Plant were not predictable and thus not recoverable as direct damages.  In much the same vein, Bransen argues that costs associated with storing the product during reprocessing are incidental damages.  But these expenditures were part of the cost of repairing Bransen's subpar product and were, thus, recoverable as direct damages.  See TransDulles Ctr., Inc., 976 F.2d at 226.

Third, Bransen challenges the district court's damages calculation, pointing to the original calculation's partial reliance on Dominion's theory that 41,094 tons of coal worth $1,830,613 were missing from Bransen's shipments.  Bransen therefore seeks a reduction of damages by $1,803,613.  Dominion abandoned this theory before trial, however, and the district court "f[ound] that the 41,000 tons of lost coal is not an element of damages in this case."  J.A. 2564; see id. at 2480.

The trial testimony of Dominion's damages expert undermines Bransen's position. The expert explained that because Dominion abandoned the missing-coal theory, he adjusted his damages report to include the alleged missing coal in the amount of material requiring processing before Dominion could use it as fuel.  Thus, compared to the original figure, the revised damages amount was decreased by the value of the alleged missing coal, while the estimated processing cost for the coal was increased to include the previously missing coal in the total amount of material requiring processing. Consequently, the total amount of damages dropped by approximately $91,000.

24

Although the revised damages report does not appear in the record, the district court's ultimate award reflects the revised amount of damages. The expert's direct examination indicates that Dominion's counsel provided Bransen's counsel with the revised report via e-mail as well as an opportunity to depose the expert regarding the revision, which Bransen's counsel scheduled but cancelled. The original damages report indicated total damages of $22,985,405, consisting of Dominion's savings by acquiring replacement coal, its loss on coal purchased from Bransen (including losses from the alleged missing coal and the costs of Dominion's remedial efforts), the increased lease costs on the CTI property, and other miscellaneous[12] damages. After trial, the district court found the total cost associated with Bransen's breach was $22,894,013, an amount $91,392 less than the damages claimed in the original damages report and thus reflecting the net difference after accounting for the no-longer missing coal just as the damages expert testified. The consistency between the expert's testimony and the revised amount of damages therefore does not produce a "definite and firm conviction" that the district court did not account for the abandoned missing-coal theory in its damages calculation and thus does not amount to clear error. Andrews v. Am.'s Living Ctrs., LLC, 827 F.3d 306, 312 (4th Cir. 2016) (quoting Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 909 (4th Cir. 1989)); see Simms v. United States, 839 F.3d 364, 386 (4th Cir. 2016)

---

[12] The other damages include increased costs of maintenance and environmental permits.

("We review factual findings relating to the calculation of damages for clear error." (citation omitted)).

## IV.

For the foregoing reasons, we affirm the district court's rulings at summary judgment as well as after trial.

<u>AFFIRMED</u>