## LOCHAVEN COMPANY

V.

## MASTER POOLS BY SCHERTLE, INC., ET AL.

Record No. 831822

June 12, 1987

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and
Cochran, Retired Justice

*Kimber L. White* for appellant.

*Fred C. Hardwick, II; James A. Howard (Eusner and Hardwick; Howard & Howard*, on brief), for appellees.

THOMAS, J., delivered the opinion of the Court.

Lochaven Company (Lochaven) sued Master Pools by Schertle, Inc. (Master Pools), for breach of a written contract to construct a swimming pool at Lochaven's apartment complex. In the contract action, Master Pools filed a counterclaim for extra work it was required to do in building the pool. Lochaven also filed a separate suit, in tort, against Virginia Pool Services, Inc. (VPS), alleging negligence in the cleaning of the same pool. Master Pools and VPS were related business entities and the two suits were consolidated for a bench trial.

Lochaven prevailed on both claims. However, it appeals because it contends the trial court awarded inadequate damages. On the contract claim, the *ad damnum* was $25,000; Lochaven's proof was approximately $21,500; Master Pools did not adduce any damage evidence other than on its counterclaim; the trial court awarded damages of $3,000 less $1,732.10 based on the counterclaim, resulting in a net award of $1,267.90. On the tort claim, the *ad damnum* was $30,000; Lochaven's proof was approximately $18,000; VPS did not adduce any damage evidence; the trial court awarded $5,350 with a $350 setoff for the cost of cleaning the pool, resulting in a net award of $5,000. Thus, based on a total *ad damnum* of $55,000 and total proof of approximately $39,500, Lochaven recovered a judgment of $6,267.90. We granted the appeal to consider the damage issues. For reasons stated below, we will affirm the judgment in the contract case but reverse the judgment in the tort case.

On July 24, 1978, Master Pools agreed, by written contract, to construct the swimming pool here in issue. The pool was to have

been 8'6" deep at its deepest point. It was also to have had a diving board. The contract price was $18,537.

The pool was constructed in 1979. It was situated on a piece of land bordering a man-made lake. It opened for use in late August 1979. When the pool opened there were problems with the water flow, the water clarity, the skimmers, and the water filtration system. Ultimately, these problems were substantially corrected. In late summer 1979, the pool was closed and drained for the winter.

In the spring of 1980, Lochaven hired VPS to clean the pool at a cost of $350. When the cleaning was completed, a VPS employee turned on the water to refill the pool, left the pool site, and locked the gate. This was on a Saturday. A hydrostatic valve at the bottom of the deep end of the pool was left open. As a result, the water ran out through the valve. By Sunday evening, part of the earthen embankment which separated the pool from the man-made lake had washed away. The washout carried away soil that supported part of the concrete apron that surrounded the pool.

Lochaven took immediate steps to stabilize the embankment by placing riprap, dirt, and railroad ties in the washed-out area. Lochaven's witnesses testified that it cost $2,101.07 to stabilize the embankment. VPS did not dispute this figure.

One month after the washout, major cracks began developing in the portion of the concrete apron on the side of the pool where the washout had occurred. In 1982, Lochaven spent $16,000 to remove the fence, break up and remove the cracked concrete, pour a replacement apron, and replace the fence. VPS did not dispute this evidence. On brief, however, Lochaven conceded that $1,100 of the $16,000 figure was spent on work other than replacing the damaged concrete apron and submitted that the proper figure attributable to the damaged portion of the concrete apron was $14,900. In addition, Lochaven proved that 161,000 gallons of water poured out through the open valve and that the lost water cost $206.21. The only thing that VPS contended with regard to damages in the tort action was that it had never been paid the $350 for cleaning the pool.

While work was underway to correct the cracks in the concrete apron, Lochaven learned that the pool was not 8'6" deep as required by the contract. Instead, the pool was only 7'9" deep. The actual depth of the pool was insufficient to permit the use of the diving board — which had to be removed. Lochaven adduced evidence that it would cost $21,500 to reconstruct the pool to con-

tract depth. This would be done by raising the sides of the pool. The fence would be removed, the concrete apron broken up, the coping around the top edge of the pool removed, a portion of the tiles removed, the skimmers raised, the sides of the walls raised, the concrete apron repoured, and the fence replaced. Master Pools did not develop evidence to challenge the $21,500 estimate.

As noted above, the only evidence of damages adduced by Master Pools in the contract case concerned its counterclaim for extra costs it said it incurred because it ran into excess ground water in building the pool. Master Pools claimed $1,732.10 for that work.

The trial court ruled from the bench concerning both claims. With regard to the tort claim, the trial court stated as follows:

> I don't believe that all the damage that the Plaintiff has attributed to this, in particular $16,000 worth of decking, can be attributed to this incident completely.
>
> So I feel that they would be entitled to the $310, which amounts to the water that was let out, plus what it cost them to fix that place. And I think they're entitled to some damage for some of the contracting that occurred. So the Court has a figure of $5,350, and I'm going to subtract $350 as being the price due Virginia Pool Service for cleaning and, therefore, give judgment for the Plaintiff in that case of $5,000.

With regard to the breach of contract claim, the trial court stated as follows:

> In the Master Pool case, the only damage that I see that the Plaintiff is asking me to assess is because the pool isn't deep enough and, therefore, does not carry a diving board, and wants to spend $21,500 to fix that remedy, when the contract on the original pool was something like $18,000 to build the whole thing to begin with.
>
> So, gentlemen, that's rather ridiculous[.] I feel they're entitled to something because of that error and something for the inconveniences that have occurred in some of the building of the pool, and I have placed a value of damage on that of $3,000.

The trial court awarded Master Pool the full $1,732.10 claimed in its counterclaim.

In our opinion, the trial court erred in assessing damages in the tort action. However, there was no error with respect to the award of damages on the breach of contract claim.

The measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct. *See Younger* v. *Appalachian Power Co.*, 214 Va. 662, 663, 202 S.E.2d 866, 867 (1974). Thus, if Lochaven proved by a preponderance of the evidence that the need to stabilize the embankment and replace a portion of the concrete apron flowed proximately from the negligent washout of the embankment, then it was entitled to recover what it proved.

It was undisputed that the water from the pool washed out the embankment. It was also undisputed that the immediate stabilization of the embankment was necessary and that it cost $2,101.07. The evidence on this point was credible and there is no indication that the trial court disbelieved it. Thus, $2,101.07 of the $5,000 award was attributable to the stabilization of the embankment. This means that only $2,897.93 of the judgment was for the replacement of the damaged portion of the concrete apron.

The trial court explained its damage award by saying "I don't believe that all the damage that the Plaintiff has attributed to this, in particular $16,000 worth of decking, can be attributed to this incident completely." Lochaven contends that there was no basis for the court's conclusion in this regard because the evidence concerning the cracks in the apron was uncontradicted. We agree.

Anita Dangerfield, the apartment's resident manager, said of the washout that "it was sinking, just like an elevator going down." She said the washout involved "the entire bank, clear back under the apron." She said further that one month after the washout "[w]e started seeing cracks in the deck." She said the cave-in extended different widths and different depths under the deck. The deck was not repaired until the fall of 1982. When it was repaired, a portion of the deck on the other side of the pool away from the lake was replaced because of a leaking pipe beneath the concrete in that area.

John Coenen, a professional engineer hired by Lochaven after the washout, also testified about the initial steps necessary to stabilize the embankment. He recommended that the washed-out area be refilled, tamped, sided, and riprapped. This was done.

Charles Tudor, a civil engineer hired by Lochaven, also testified concerning the washout and the cracks. He found that the embankment had opened up under the apron about fifteen feet. Two years later he examined the cracks. He said the cracking of the apron was consistent with the failure of the underpinning. He recommended that the affected part of the apron be removed. On cross-examination, he said he noted shrinkage cracks on the portion of the apron on the side of the pool away from the embankment. He explained, however, that the big cracks — which he illustrated on a drawing that was admitted into evidence — were caused by the subsidence of the soil. He also explained that once there was a washout, there was no way to replace the dirt under the concrete apron. In Tudor's words, it is "very hard to stuff subgrade back under a slab."

The trial court then engaged in the following exchange with Tudor:

THE COURT: There are many other reasons in swimming pools, are there not, that the aprons around them crack and the squares move up above — when you lay them in squares, one comes up higher than the other?
A. Yes, Sir.

. . . .

THE COURT: So some of the cracking, at least on the other side, you would not attribute to this water business?
A. No, Sir.
THE COURT: And you not — with the facts I've given you, it would be difficult to say even that these cracks on the lake side came from the water?
A. Well, it definitely had subsided and the cracks had opened up. The cracks on the other side, you've got hairline cracks, but these —
THE COURT: Were bigger?
A. Oh, yes, you could stick a pencil down in the cracks.

William F. Roady, another witness, was employed by Lochaven to replace the cracked portion of the concrete apron on the lake side of the pool. The replacement was not quite half around the pool. The work involved removing the fence, removing the damaged deck, recompacting the dirt under the affected area, installing gravel, repouring the deck, and replacing the fence. He was

actually paid $16,000 for the repair work. He testified that the basic foundation under the lake side of the decking had weakened and that was what caused the cracks.

The only suggestion in the evidence that the cracked concrete which was replaced was not caused by the washout was raised in the trial court's questions to Tudor. Yet the answers the trial court received in that exchange do not justify the conclusion that a portion of the cracking on the lake side of the pool was not attributable to the washout. Tudor simply agreed that there are many reasons for which concrete cracks. Yet no other reasons were given that would explain the cracking which occurred here. And more importantly, there is no other evidence in the case to explain the large cracks on the lake side of the pool. The witness agreed with the court only to the extent that some of the cracks "*on the other side*" of the pool were not attributable to the water. However, that answer does not support the trial court's conclusion because the portion of the apron on the other side of the pool was not replaced except for a very small area where there was an underground leak. Finally, the witness did not agree with the court that he could not attribute the cracking on the lake side of the pool to the washout. The witness explained that the cracks on the lake side of the pool that were repaired were bigger — big enough to stick a pencil into. In our opinion, the evidence was insufficient to support the trial court's conclusion that the damages claimed by the plaintiff in the tort case were not attributable to the washout.

■ We hold that the damages awarded in the negligence action were inadequate. In our view, Lochaven was entitled to recover the cost of stabilizing the embankment, the cost of the lost water, and the cost of repairing the damaged concrete apron excluding work that was not originally part of the apron.

■ We turn now to the question of damages for breach of contract. That aspect of the case was tried on the basis of the cost measure of damages. Thus, the adequacy of the award under that theory is the only matter before us. The cost measure is calculated on the basis of the cost to complete the contract according to its terms or the cost to repair what has been done so that the contract terms are met. The cost measure is appropriate *unless* the cost to repair would be grossly disproportionate to the results to be obtained, or would involve unreasonable economic waste. *See Green v. Burkholder*, 208 Va. 768, 771, 160 S.E.2d 765, 768 (1968);

*Kirk Reid Company* v. *Fine*, 205 Va. 778, 789, 139 S.E.2d 829, 837 (1965).

■ The only question we are called upon to decide in the contract action is whether the trial court was bound to award Lochaven $21,500 since no countervailing damage figure was proved by Master Pools. We hold that the trial court was not so bound because the cost measure of damages will not be awarded in cases where the property must be substantially demolished before it can be brought into compliance with the contract provision or in cases where the cost of compliance is grossly disproportionate to the benefit to be achieved. Here, both exceptions came into play. To build the pool to contract requirements necessitated the substantial destruction of the pool. Further, it would have cost $21,500 to add nine inches to the depth of the pool so that a diving board could be used. In our view, the cost would have been grossly disproportionate to the benefit. Thus, the trial court did not err in refusing to award Lochaven $21,500 on its contract claim.

In light of the foregoing, we will affirm so much of the trial court's judgment as concerned the award of damages in the breach of contract action; we will reverse so much of the judgment as concerned the award of damages in the tort action, and will remand that portion of the case for a new trial limited to the issues of damages.

*Affirmed in part,*
*reversed in part,*
*and remanded.*