# CIRCUIT COURT OF BUCHANAN COUNTY

Pocahontas Mining, L.L.C.

v.

Jewell Ridge Coal Corp.
and Thames Development, Ltd.

November 24, 2003

Case No. CH21-01

BY JUDGE KEARY R. WILLIAMS

The Court has now fully considered the testimony of the witnesses from the Bench Trial convened in this matter from September 30, 2003, to October 2, 2003, and the representations and arguments of Counsel made at that trial, including all relevant legal authority. The Court now renders the following opinion.

## I. *Plaintiff's Request for Specific Performance*

The Plaintiff, Pocahontas Mining, L.L.C. ("PMC") previously came before this Court seeking interpretation of and specific enforcement of its 1941 Lease and 1969 Amendment with Jewell Ridge Coal Company ("JRCC"), which would require the Defendant to fully and completely comply with the terms and conditions of that Lease upon the October 31, 2001, expiration date. In the first action before this Court, the Plaintiff sought a Declaratory Judgment in order for the Court to interpret exactly what the terms and conditions of the lease were. As a result of that action, this Court found that the Defendant was obligated to:

restore all fixed machinery and fixed equipment at the preparation plant to functional capabilities and operational standards at a level consistent with health, safety, and environmental laws, rules, and regulations in effect on the last date Defendant commercially operated the preparation plant.

*Pocahontas Mining, Limited Corp. v. Jewell Ridge Coal Corp.*, No. CL 290-98, Final Order, ¶ 2 (Buchanan County Cir. Ct. Nov. 30, 2000).

Thus, after this Court established that the Defendant did have certain obligations to return a functional coal preparation plant to the Plaintiff upon termination of the lease, the Plaintiff instituted a second action before this Court after the lease expired on October 31, 2001, seeking specific performance.

This Court convened a Bench Trial on September 30, October 1, and October 2, 2003, in this matter. After considering the evidence and testimony presented at trial, this Court now finds that specific performance is the appropriate remedy for the Plaintiff based upon a number of findings.

First, this Court finds that the Defendant acknowledged its obligation to comply with the terms of the 1941 Lease and 1969 Amendment even before these actions came before this Court. On July 14, 1980, JRCC's then President Mr. I. C. Spotte acknowledged in writing in a letter to PMC's then President Mr. Ralph Dye the reversionary interest in the plant that PMC was entitled to upon the expiration of the lease. Plaintiff's Exhibit 4. The letter specifically states:

We acknowledge your reversionary interests in the Preparation Plant as set forth in the Supplemental and Amended Agreement of Lease dated November 1, 1969, and we fully intend to comply with that Lease Agreement. You may rest assured that the Preparation Plant will be intact upon termination of the Lease.

Plaintiff's Exhibit 4.

Towards the end of the lease, after it became clear that the plant was not going to be intact upon termination of the lease, JRCC denied that such a reversionary interest existed. On January 4, 2001, in a letter from JRCC's representative Mr. Robert A. McGregor to PMC's President Mr. Brewster Righter, JRCC indicated that:

> Jewell Ridge believes that it is in compliance with all lease provisions . . . we do not intend to reconstruct the existing plant or build a new one unless the Court orders us to do so. Instead . . . we will proceed to reclaim the existing structure.

Plaintiff's Exhibit 5.

Second, this Court finds that JRCC breached its obligation to return to PMC an intact and operational preparation plant, with all fixed machinery intact at the expiration of the lease on October 31, 2001. The Court heard considerable testimony with regard to the condition of the Jewell Number 11 preparation plant prior to the reclamation of the plant. The Jewell Number 11 plant was shut down in 1979, after which time it was never reopened. There are conflicting reports as to the condition of the Jewell Number 11 plant after it was closed. Plaintiff's Exhibit 17, a report from VenCoal, Inc., states, "all of the equipment was removed from one plant, No. 11, and processing was consolidated into the two remaining plants, No. 18 and No. 12." The testimony of Mr. Charles Peters indicated that certain pumps necessary for the operation of machinery might have been removed from some of the equipment in the Jewell Number 11 preparation plant. Numerous witnesses testified that, after the plant closed and before it was reclaimed, it was in serious disrepair. Some even classified the plant as "junk." The plant finally underwent the reclamation process, given the need to comply with state mining laws and regulations, the plant's deteriorating condition, and the unlikelihood that it would be repaired or reopened. By all accounts, the Jewell Number 11 plant was either cannibalized by intentional act or vandalized, in addition to being abandoned and unattended to for a period of almost twenty years, leading to a plant that was not intact, functional, or operational by the expiration of the lease agreement on October 31, 2001.

Having made these findings, the Court now examines the appropriateness of the requested remedy, specific performance. Virginia law has long held that specific performance is the preferred remedy where real estate is involved, as the law recognizes the unique nature and characteristics of real property. *Gaynor v. Hird*, 11 Va. App. 588 (1991), citing *Hale v. Wilkinson*, 62 Va. 734 (21 Gratt.) 75, 80 (1871). The exception to this rule, as cited by the Defendant, is where economic waste would occur were specific performance ordered. *Lochaven Co. v. Master Pools by Schertle, Inc.*, 233 Va. 537 (1987). The economic waste rule bars specific performance where "the cost to repair would be grossly disproportionate to the results to be obtained, or would involve unreasonable economic waste." *Id.* at 543.

The Court finds that the Jewell Number 11 preparation plant and the property immediately surrounding the plant itself are unique, real properties. The Court heard considerable testimony with regard to the unique nature of the property, with a coal preparation plant on the property and a large amount of coal reserves and seams in the immediate area near the plant, which would allow the plant to be utilized again for coal preparation purposes. The testimony of Mr. Charles Peters before this Court suggested that, if the plant were reconstructed, with minor modifications, specifically by adding a rewash cycle to the Deister table circuitry of the Jewell Number 11 plant, the plant could accommodate the preparation and washing of Tiller, Jawbone, and blends of these coals.

Thus, this Court finds that, were the Jewell Number 11 plant reconstructed, modifications to the plant could result in efficient and effective preparation of these coals, leading to substantial income as a result of the reopening of this plant and the mining of the reserves on PMC property. The Court notes, however, that the ultimate market price per ton of coal is a major factor as to the mineability and marketability of coal. Therefore, this Court is not in a position to and cannot reach any conclusion as to the marketability of coal prepared in a replica plant with any certainty due to frequent market fluctuations. Thus, finding that reconstruction of the Jewell Number 11 preparation plant would be of substantial benefit to the Plaintiff by providing a means by which to wash the substantial coal reserves held by PMC, this Court rejects the Defendant's contention that the economic waste rule would preclude specific performance in this case.

Therefore, having made all of the above factual findings, this Court finds that specific performance is the appropriate remedy in this case. However, this Court cannot order specific performance of the lease agreement by ordering the Jewell Number 11 preparation plant to be reconstructed because of impossibility. Generally, if a promisor's contractual performance is made impossible by a "change in character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance, the promisor will be excused, unless he . . . expressly agreed in the contract to assume the risk of performance." *Housing Auth. of the City of Bristol v. East Tennessee Light & Power*, 183 Va. 64, 72, 31 S.E.2d 273, 276 (1944).

Based upon the testimony and evidence heard by this Court during the Bench Trial, the Jewell Number 11 preparation plant has already undergone the reclamation process, rendering it impossible for JRCC to return to PMC the preparation plant intact and operational. Furthermore, the components from the 1979 Jewell Number 11 facility are either unavailable or comparable

replacement components are not available given consideration to the drastic improvements in mining technology since the plant was originally constructed. Further litigation would result if this Court were to require JRCC to reconstruct the Jewell Number 11 plant, as the parties would likely disagree as to the state of the components to be used and whether the replacement components were of like size, condition, and state of the art technology as existed in the 1979 Jewell Number 11 plant. This Court is not in a position to order specific performance and then have to monitor the reconstruction of this preparation plant. Thus, finding that specific performance is impossible, this Court finds that awarding the Plaintiff a certain measure of damages is the appropriate remedy for JRCC's breach of the lease agreement.

Accordingly, this Court declares that the proper remedy is an appropriate measure of damages to fully and fairly compensate the Plaintiff for the loss sustained by JRCC's noncompliance with the terms and conditions of the 1941 Lease and 1969 Amendment by failing to return to the Plaintiff an intact and operational coal preparation plant upon the expiration of the lease term on October 31, 2001.

## II. *Appropriate Measure of Damages*

The Court heard testimony from both the Plaintiff's witnesses as well as the Defendant's witnesses with regard to the estimated replacement cost of the Jewell Number 11 preparation plant. The Court heard considerable testimony from the Plaintiff's witness Mr. Charles Peters, a coal preparation plant expert engineer and designer. Mr. Peters testified that he personally examined the Jewell Number 11 preparation plant and worked on it over the years. Further, he made a preliminary investigation into the functionality and efficiency of the plant before it was reclaimed, finding that the plant could have been maintained and modified over time to ensure that it remained in a functional capacity to the end of JRCC's lease period. In addition, Mr. Peters testified that, if modified, the plant would have the ability to efficiently clean coal seams other than Raven/Red Ash coal, which the plant was originally constructed and designed to clean. After testifying at length and in great detail with regard to the type of equipment and circuitry the plant contained, Mr. Peters reached an ultimate conclusion that the replacement value of the Jewell Number 11 coal preparation plant is $11.7 million dollars.

The Court also heard the testimony of the Defendant's witness Mr. Jim Powell, who testified with regard to the reconstruction cost of the Jewell Number 11 preparation plant. Mr. Powell testified that the Jewell Number 11 preparation plant could be reconstructed at a cost of $4.5 million dollars. The

Court considered this evidence and weighed Mr. Powell's testimony against that of Mr. Peters. After weighing the testimony of Mr. Peters against that of Mr. Powell, the Court concluded that the testimony of Mr. Peters is more credible and more reliable, due to the fact that Mr. Peters has more experience with coal cleaning and preparation plants and, specifically, because Mr. Peters has more exposure to and experience with the particular components in the Jewell Number 11 preparation plant. In addition, Mr. Peters has more experience constructing, designing, and valuing coal preparation plants than Mr. Powell does.

The Court also heard considerable testimony from the Defendant's witness Mr. Roger Daugherty with regard to his estimate of the plant's market and liquidation value. Mr. Daugherty testified that as an asset, the market value of the Jewell Number 11 preparation plant would be $0 even if it were in operating condition. Mr. Daugherty further testified that, as a liquidation asset, the plant would have a negative value of $125,000, as a demolition contractor would have to be paid to tear down the plant for scrap. However, this Court outright rejects the testimony of Mr. Daugherty that the fair market value of the Jewell Number 11 preparation plant is either $0 or negative $125,000.

Having carefully weighed the testimony of each of these witnesses, the Court has placed the most credibility and value upon the testimony of Mr. Charles Peters and, thus, adopts his estimate that the Jewell Number 11 preparation plant could be replaced for $11.7 million dollars.

The estimated cost of replacing one piece of equipment in the Number 11 plant was a point of controversy, as conflicting evidence regarding this equipment was presented before the Court. Mr. Peters testified that the Raymond flash dryer, one of the components of the plant, is no longer available, which constituted $5.6 million dollars of his replacement cost figure. However, the Defendant's witness Mr. David Carris testified that all constituent parts of the Raymond flash dryer were still available and that the dryer could be reconstructed for $1.6 million dollars. The Court has considered this conflicting testimony and finds that Mr. Carris's testimony with regard to the ability to recreate the Raymond flash dryer is credible. Accordingly, the Court adopts the figure quoted by Mr. Carris as the replacement figure for the Raymond flash dryer and will deduct from the total amount of the replacement value of the Jewell Number 11 preparation plant $4 million dollars, reducing the total replacement cost from $11.7 million dollars to $7.7 million dollars.

Upon reaching the conclusion that the fair market value replacement cost of the Jewell Number 11 preparation plant is $7.7 million dollars, the Court is

faced with the difficult problem of ascertaining by what percentage this figure must be depreciated due to the age and condition of the plant.

The Court has found some merit in the testimony of the Defendant's witness, Mr. Carris with regard to his calculation of the depreciated replacement value of the Jewell Number 11 preparation plant demonstrated in Defendant's Exhibit 20. In Defendant's Exhibit 20, Mr. Carris estimated the depreciated replacement value of the Jewell Number 11 preparation plant to be between $356,000 to $1,456,000, assuming the plant had between one to five years of remaining operating life. Mr. Carris also prepared a second estimate, depicted in Defendant's Exhibit 21, which further depreciated the value of the Jewell Number 11 plant. In Defendant's Exhibit 21, Mr. Carris cited a number of factors he utilized in making the determination that the fair market value of the Jewell Number 11 preparation plant would be lower than the actual depreciated value of the plant, reflected in Defendant's Exhibit 20. These factors included the age of the structure, length of time since the plant was modified, presence of asbestos in the plant, environmental problems faced due to the use of thermal dryers, technical limitations, the plant's ability to only process Raven coal, and the location of the plant in proximity to the reserves held by PMC.

The Court failed to relate to Defendant's Exhibit 21 with regard to the sensitivity analysis reflecting additional depreciation of the Jewell Number 11 plant and did not find a basis for further reduction from the depreciated replacement value based upon plant specific factors expressed by Mr. Carris in his testimony before the Court. The Court finds no merit in reducing the depreciated replacement value of the plant by fifty percent based upon these factors cited by Mr. Carris, as the Court has already made a factual finding that the Jewell Number 11 preparation plant would be of substantial benefit to PMC had the plant been maintained and modified over the course of its lifetime instead of having its equipment removed and being allowed to deteriorate. The Court has, therefore, discounted the figures presented in Defendant's Exhibit 21 and relies only upon the information presented in Defendant's Exhibit 20, as the Court finds those calculations are a better representation of depreciated replacement value based upon the evidence presented with regard to the potential benefit of the Jewell Number 11 preparation plant were it intact, functional, and operational as of the expiration date of the lease on October 31, 2001.

In addition, the Court has further considered the testimony of the Plaintiff's witness Mr. Ellis with regard to the Jewell Smokeless preparation plant that is of similar age as that of the Jewell Number 11 preparation plant. The Jewell Smokeless preparation plant has undergone modifications over the

course of its lifetime and continues to be an efficient and productive preparation plant, lending to this Court's conclusion that the Jewell Number 11 preparation plant, if it were maintained and modified during its lifetime, could still be an efficient, functional, and operational preparation plant.

Based upon the above findings, this Court has determined that the Jewell Number 11 preparation plant had an estimated remaining useful life of ten years, in consideration of Mr. Ellis's testimony regarding the Jewell Smokeless preparation plant and its estimated remaining useful life. Thus, the Court will apply the formula used by Mr. Carris in Defendant's Exhibit 20 to determine the depreciated replacement value of the Jewell Number 11 preparation plant. However, the calculations in Defendant's Exhibit 20 only assume the plant has a remaining operating life of one to five years. Therefore, the Court will use the formula provided in the testimony of Mr. Carris and supply the appropriate figures to reach an estimated depreciated replacement value for the Jewell Number 11 preparation plant, based upon ten years of remaining useful life.

Thus, when the formula is applied using the appropriate figures, the Court finds that the appropriate measure of damages recoverable by the Plaintiff from the Defendant for breach of the lease agreement is $2,566,666.40 (10/30 x $7,700,000). In addition, the Defendant is ordered to pay interest on this amount, in accordance with the mandated legal rate of interest, from the date of the breach of the lease, October 31, 2001, to the date the Final Decree is rendered in this case and thereafter at the present legal rate of interest until the judgment is satisfied in full.

### III. *Attorney's Fees, Costs, and Expenses*

The Plaintiff also set forth certain costs and expenses related to this litigation that they request be awarded by this Court as damages. Ms. Pam West, Vice-President of PMC, testified with regard to costs incurred by the Plaintiff as a result of this litigation. These costs and expenses include the following: travel and meal expenses; litigation expenses incurred for retaining Mr. Elsey Harris of Mullins, Harris, & Jessee; litigation expenses incurred from PMC's in-house counsel, Mr. Don Johnson; expert testimony from Mr. Stagg, Mr. Andy Cecil, and Mr. Charles Peters; and court reporter expenses.

After reviewing the testimony presented at the Bench Trial, the Court has determined that certain named expenses will not be allowed as damages. The Plaintiff cited expenses in the amount of $52,045.65 related to transportation, lodging, and meals associated with this litigation. The Court will not allow those expenses as recoverable damages.

The Plaintiff also cited an expert witness expense associated with the testimony of Mr. Alan Stagg in the amount of $37,481.96. The Court has carefully weighed and considered the testimony of Mr. Stagg in comparison to the testimony of other expert witnesses heard during the trial and has determined not to allow his fees as recoverable damages by the Plaintiff. The Court found the models presented by Mr. Stagg and his testimony to be of little value in determining the economic loss sustained by PMC, as these models and much of his testimony were based upon numerous assumptions. Furthermore, Mr. Stagg testified that he is an economic geologist. Based upon the testimony he provided to the Court and his qualifications as a geologist, Mr. Stagg is not qualified to support the opinions he rendered with regard to the economic loss PMC purportedly sustained. Thus, the Plaintiff has failed to meet its burden of proof with regard to the damages and lost opportunities testified to by Mr. Stagg and the Court will not allow those expenses to be recovered from the Defendant as damages.

The Plaintiff also cited expenses in the amount of $134,311.49, in connection with the attorney's fees of Mr. Don Johnson. The Court is not inclined to allow the Plaintiff to recover these expenses, as Mr. Johnson is employed by PMC as their in-house general counsel. Furthermore, PMC retained Mr. Elsey Harris of Mullins, Harris, & Jessee as outside private counsel to represent their interests in this matter. Thus, this Court will not permit Mr. Johnson's fees to be recovered by the Plaintiff, as the Defendant should not be required to compensate Mr. Johnson for work that he is retained by the Plaintiff to do in the ordinary course of their business.

Therefore, this Court determines that the following expenses cited by the Plaintiff are allowable as damages and thus recoverable from the Defendant: litigation expenses incurred from representation by Mr. Elsey Harris of Mullins, Harris, & Jessee in the amount of $105,431.29; expert witness fees for Mr. Andy Cecil in the amount of $55,223.10 and Mr. Charles Peters in the amount of $3,500.00; and court reporter fees in the amounts of $779.70 and $500.00. The total amount of damages for costs and expenses incurred by the Plaintiff during the course of this litigation is thus $165,434.09.