COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Fulton[*] and Lorish
Argued at Fairfax, Virginia

UNPUBLISHED

STUDIO 76, LLC

v.       Record No. 1227-24-4

YIQUN GUO, ET AL.

MEMORANDUM OPINION[**] BY
JUDGE CLIFFORD L. ATHEY, JR.
JANUARY 20, 2026

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

Roya Vasseghi (Vasseghi Law Group, on briefs), for appellant.

Sean Patrick Roche (Joseph R. Coules; Cameron/McEvoy, PLLC, on
brief), for appellees.


Studio 76, LLC ("Studio 76") appeals from a judgment entered against it in the Circuit

Court of Fairfax County ("circuit court").  The judgment arose as a result of a counterclaim for

breach of a construction contract ("Contract"), and the circuit court awarded monetary damages,

attorney fees, and costs to Yiqun Guo ("Guo") and Ruijing Chen (collectively, "Homeowners").

On appeal, Studio 76 assigns error to the circuit court for reconsidering, "without a legal basis,"

the court's initial ruling that neither party could recover damages on their competing breach of

contract claims.  Studio 76 also assigns error to the circuit court for failing to find that the

Homeowners' failure to fully pay the balance due under the Contract barred them from

recovering on their counterclaim.  In addition, Studio 76 assigns further error to the circuit court

for failing to hold that the Homeowners materially breached the Contract by interfering with the

---

[*] Justice Fulton participated in the hearing and decision of this case prior to his
investiture as a Justice of the Supreme Court of Virginia.

[**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

performance thereof.  Finally, Studio 76 contends that the evidence was insufficient to support the circuit court's judgment awarding damages on the Homeowners' counterclaim.  Finding no error, we affirm the circuit court's judgment.

## II.  BACKGROUND[1]

Studio 76 is a design-build construction firm that specializes in designing and constructing custom-built homes.  In May of 2017, Studio 76 entered into the Contract with the Homeowners to complete the construction of their future home located in Falls Church, Virginia.  The Homeowners had previously entered into a contract with another contractor to build their future home in Falls Church, but the contractor abandoned the project prior to completing the home.  Studio 76 and the Homeowners entered into the Contract, in part, by incorporating the earlier contract.  Thus, Studio 76 obligated itself to complete the construction of the home in accordance with the specifications in the incorporated contract, along with other additional specified work, for $431,436.  The Contract provided, inter alia, for the replacement of a previously installed HVAC system with a specific type of HVAC system as well as the revision and installation of related duct work.  The replacement HVAC system specified under the Contract was to consist of two "Carrier Performance 96 gas furnaces" and two "Carrier Performance 16 heat pumps, 25HCB6 (16.5 SEER)."  Thermostats were also to be installed on the first and second floors, with the first-floor thermostat controlling the temperature in both the first floor and basement zones.  Additionally, the home was required to be Energy Star certified.  Studio 76 was also required to complete the home "in a workmanlike manner and in compliance with all applicable building, zoning and fire codes."

The Contract further provided that following lender approval of the Contract, receipt of applicable permits, and payment of the deposit, Studio 76 was to complete the construction project

---

[1] Under settled appellate principles, we view the evidence in the light most favorable to the Homeowners, the prevailing party in the trial court.  *See Moncrieffe v. Deno*, 76 Va. App. 488, 494 (2023).

and obtain a certificate of occupancy within six months, with time being of the essence. A liquidated damages clause was also included in the Contract and provided that, if Studio 76 failed to complete work on the project by the six-month deadline, it would owe the Homeowners a "late fee" of $100 for every day thereafter that the project remained incomplete, unless the Homeowners caused the delay.

The Contract also provided for the third-party lender to "control[]" payments to Studio 76. The Contract identified the Homeowners' bank as the third-party lender and also provided for the Homeowners' bank to inspect Studio 76's work and pay Studio 76 for the work completed according to a draw schedule. The agreed upon draw schedule consisted of an initial deposit and four subsequent disbursements based upon the progress made by Studio 76 as certified by the Homeowners' bank. Finally, Paragraph 14 of the Contract provided that, in the event of a claim for breach of contract, the prevailing party "shall be entitled to recover its reasonable expenses, including actual attorney's fees, incurred [sic] prosecution or defense of such claim."

As the project progressed, the Homeowners' bank disbursed payments to the Homeowners, who then transferred the payments to Studio 76 as the work was completed. During the project, the parties also executed several change orders, adjusting the total price of the Contract to $434,302. On July 31, 2018, Studio 76 obtained a certificate of occupancy for the home from Fairfax County. Studio 76 then requested payment of the final draw. The final disbursement pursuant to the draw schedule was to occur in August of 2018, however, rather than paying Studio 76 the final draw, the Homeowners continued to ask Studio 76 to perform outstanding work on the project. Initially, Studio 76 continued to work to complete the items requested by the Homeowners. By October of 2018, Studio 76 ceased work and sent the Homeowners a "material breach letter" because Studio 76 was "not getting paid per the contract requirement." The

Homeowners responded that they would pay the withheld amount once Studio 76 completed the project.

Studio 76 subsequently filed a complaint against the Homeowners alleging a material breach of contract, breach of contract, quantum meruit, and fraud in the inducement.[2] The complaint alleged that the Homeowners had materially breached the contract by withholding part of the final disbursement made pursuant to the draw schedule. It also contended that the Homeowners had committed a breach of contract by requesting additional work outside of the contractual scope of work and for failing to pay for same.[3]

In response, the Homeowners filed both an answer to the complaint as well as a counterclaim alleging that Studio 76 had breached the contract by 1) failing to complete the project "in a workmanlike manner and/or in accordance with the Construction Agreement"; 2) failing to timely complete the work; and 3) abandoning the project. The Homeowners also alleged that Studio 76 was "continuously behind schedule" during the project and "frequently" requested payments in advance of the draw schedule requiring the Homeowners to pay out of pocket. Finally, the Homeowners alleged that Studio 76 failed to complete work, remediate defective work, and obtain an Energy Star certificate for the home as required by the contract. The Homeowners sought an award of compensatory damages, reimbursement of attorney fees, and costs.

A bench trial on the parties' competing claims began on September 19, 2022. At trial, Nate Penati ("Penati"), co-owner of Studio 76, testified that the Homeowners had only paid a total of

---

[2] The circuit court later struck the quantum meruit and fraud-in-the-inducement claims at trial. On its claim for material breach of contract, Studio 76 sought compensatory damages, attorney fees, and costs. For breach of contract, Studio 76 sought compensatory damages and costs.

[3] Studio 76 additionally alleged that the Homeowners delayed completion of the project by failing to obtain necessary plans, permits, and approvals; requesting additional work; visiting the construction site "almost daily"; undoing items that Studio 76 had completed; and failing to turn on the gas to the home in a timely manner.

$376,300 over the life of the contract, leaving an unpaid balance of $58,002 when Studio 76 ceased work. In addition, Penati testified that the Homeowners kept an Excel spreadsheet of pending items to be completed, which included more detailed specifications than were included in the Contract. He also testified that the Homeowners asked Studio 76 to redo several already-completed items, including electrical work, brickwork, and roofing. Penati further testified that the Homeowners caused many delays, in part, by requesting changes to the contracted work "[a]lmost daily" via email, text, and on-site communications. He explained that Guo regularly visited the construction site to inspect the work and issue directions to Studio 76 and its subcontractors, even after Penati asked him to refrain from doing so. Penati acknowledged that Studio 76 accepted most of the Homeowners' changes without requiring written modifications to the Contract; however, he also explained that Studio 76 incurred additional costs for the labor and materials needed to complete the Homeowners' requested changes to the work. Penati further acknowledged that Studio 76 had failed to install a dual-zone HVAC system for the basement and first floor of the home.[4]

Guo testified as to the disbursements made by the Homeowners' bank to him as well as the corresponding payments that he made to Studio 76. In addition, a spreadsheet he created showing the disbursements made by the Homeowners' bank and the payments the Homeowners made to Studio 76 was admitted in evidence. Both Guo's testimony and the spreadsheet he prepared showed that while he paid all other disbursements from the lender to Studio 76, he withheld $58,170 from the final disbursement. According to Guo, the amounts withheld included $32,178 as a result of Studio 76's failure to complete work, a $16,000 late fee penalty under the liquidated damages clause of the contract, and $6,957.59 in cash payments Guo claimed to have paid out-of-pocket for

---

[4] Guo sent Penati an email on August 28, 2018, asking when the "basement ac zone and energy star" would be completed. In an email dated September 1, 2018, Penati assured Guo that Studio 76 was "committed to deliver the home per contract requirement for energy star and basement HVAC zoning."

materials and third-party work that either Studio 76 failed to account for or was necessary to correct Studio 76's work.[5] Guo further testified that when Studio 76 ceased work, many items, including the electrical wiring on the home, HVAC system, and Energy Star certification, remained incomplete. Guo also explained that Studio 76 had failed to complete the installation of a temperature zone for the basement.[6] Guo also testified that he had sent frequent emails to Studio 76 and conducted on-site inspections but indicated he had done so to ensure remediation of outstanding issues and to meet with Studio 76 employees. He also denied interfering with Studio 76's work and visiting the site as often as Penati claimed he did.

The Homeowners' expert, Alan Korobkin ("Korobkin"), explained that a SEER rating quantifies airflow efficiency and that a higher SEER rating saves energy costs. He further opined that while the installed heat pump was "correct as specified," the HVAC system Studio 76 installed could not achieve a 16.5-SEER rating because it lacked fresh air ventilators and had an undersized coil. Korobkin's expert report was admitted in evidence and concluded that the current HVAC system: 1) was not Energy Star compliant; 2) could only operate at a 15.5-SEER rating; 3) exhibited "[p]oor workmanship and incomplete wrapping of tubing"; and 4) was missing "dampers, duct work, fresh air ventilators, and required thermostats." To repair these deficiencies, Korobkin estimated a cost of $42,100.

In rebuttal, Penati testified that Studio 76 did not install the duct work—it was already in place when Studio 76 commenced work. He also explained that Studio 76 did not replace any of the duct work.

---

[5] Additionally, $3,000.75 appears to be attributable to contracted work that Studio 76 "left remaining." The reason for the difference in the total amount withheld by the Homeowners ($58,170) and the amount remaining on the contract ($58,002) is not apparent from the record.

[6] The chart of disbursements that Guo presented to the circuit court reflected that the lender had approved the HVAC installation and that the Homeowners paid $9,000 for the HVAC installation.

Following trial, the circuit court issued a memorandum opinion on January 4, 2023, concluding that the Homeowners had "unilaterally" altered the manner in which the lender disbursed the payments and withheld $32,178 from the final disbursement "as a retainage for [Studio 76] to 'complete' the Project by repairing defective work and completing unfinished work." The circuit court also found that the Homeowners breached the Contract because the Contract required them to timely render all payments to Studio 76 upon the lender's disbursement and the Contract did not permit retainage for incomplete work. The circuit court further found the Homeowners' breach to be a material breach of the Contract. As a result, the circuit court held that the Homeowners committed the first material breach of the Contract and were therefore barred "from enforcing the contract."[7] The circuit court further concluded that Studio 76's claims "failed either as a matter of law or evidence" and that Penati's testimony was "unpersuasive and lacking in credibility."

The circuit court also found that Studio 76 failed to complete certain work according to contract specifications and that the Homeowners would be entitled to damages if an appellate court reversed its ruling "on the doctrine of first material breach." The circuit court listed the work that Studio 76 had failed to complete, tallied the damages it would have awarded for each item, and subtracted the $32,178 that the Homeowners had withheld as an offset—resulting in a total potential award of $19,172.[8] When assessing the HVAC damages, the court opined that "[t]he evidence did not prove that the HVAC claims were material breaches of the agreement"

---

[7] The circuit court found that Studio 76 had not committed a material breach by failing to adhere to the "'time is of the essence' provision." The court reasoned that any claim of breach was waived because 1) the liquidated damages provision—which the court ruled was unenforceable—"kept the contract in force"; and 2) the Homeowners continued to "treat[] the contract as being in force."

[8] Without further explanation, the circuit court calculated the subtotal of damages to be $50,350 but stated that it would have awarded $51,350 less the retained sum of $32,178.

and that the location of the bath fans and the floor vents was immaterial. The court noted that fresh air ventilators were missing and that it would have awarded $1,000 for the ventilators. In March of 2023, the circuit court entered an order dismissing both parties' claims with prejudice and continuing the matter to resolve the competing claims for attorney fees and costs.[9]

While the parties were briefing the issue of attorney fees and costs, the Homeowners moved the circuit court to reconsider its previous January 4, 2023 memorandum opinion. In support, the Homeowners challenged the court's application of the first material breach doctrine to the facts of this case on three alternative grounds. First, the Homeowners contended that Studio 76 had committed the first material breach of the contract by, inter alia, engaging in "shoddy workmanship." Next, the Homeowners asserted that the "first breach doctrine's 'no recovery rule'" did not apply to construction disputes involving competing claims where deviations from the contract were not made in bad faith. Finally, the Homeowners claimed that their failure to pay the full amount due was not a material breach because they had made substantial payments under the contract. In addition, based upon the testimony of their expert witness as to damages, the Homeowners also contended that they were entitled to a greater amount of damages for the HVAC repairs by pointing to Studio 76's "fail[ure] to install any HVAC within the basement of the home."

On April 11, 2024, the circuit court issued a second memorandum opinion wherein the court reconsidered its prior decision and reversed its prior ruling that the Homeowners' breach barred their recovery, reasoning that under *Erlich v. Hendrick Construction Co.*, 217 Va. 108, 114 (1976), "the no recovery rule may be inapplicable in a construction case if there has been substantial performance, and offsetting claims exist." In support, the circuit court reasoned that it would be "inappropriate" to apply the no recovery rule to the facts present here because: 1)

---

[9] By agreed order entered prior to trial, the issue of attorney fees was bifurcated.

"both parties were at fault and, at times, acted unreasonably"; 2) there was no bad faith; and 3) the Homeowners made "substantial payments . . . leading up to the final disbursement." The circuit court also found that Studio 76 did not commit the first material breach and that the Homeowners' alleged "extensive involvement and unwelcome oversight" was not a material breach, noting that the Homeowners' actions "did not materially hinder or impede performance." In addition, the circuit court held that the dual-zone HVAC system was a "bargained-for benefit that [wa]s material to the contract," Korobkin's estimate was reasonable, and the Homeowners were entitled to collect $42,000 "for the incomplete and incorrect installation of the HVAC system." As a result of the circuit court reconsidering its prior rulings, the court awarded the Homeowners a judgment in the amount of $61,172 after "applying the necessary offset."[10] Finally, after determining that the Homeowners were the prevailing party pursuant to Paragraph 14 of the Contract, the circuit court also awarded the Homeowners attorney fees and costs.

Following the issuance of the circuit court's April 11, 2024 memorandum opinion, Studio 76 moved the circuit court to reconsider the court's second opinion. Following a hearing on the second motion for reconsideration, the circuit court denied the motion.[11] Then, on June 3, 2024, the circuit court issued a third memorandum opinion, in part, explaining why the court reconsidered its initial rulings and why it decided to deny the motion for reconsideration filed by Studio 76. In its final memorandum opinion, the circuit court stated that it became "aware that it had erred" and determined that its initial findings "could not be sustained" after considering the Homeowners' initial motion for reconsideration. The circuit court further opined that although "payment [wa]s a material term of the contract," "the failure to make final payment should not

---

[10] In calculating the amount of damages, the circuit court appears to have added $42,000 to its original damages calculation—$51,350—before subtracting $32,178

[11] A timely filed transcript of the hearing on Studio 76's motion for reconsideration has not been made part of the record on appeal.

be considered a material breach that would preclude the final exchanges of claims and offsets under a long-standing construction contract or any contract under which substantial payments or performance have been rendered."

The circuit court further explained that its initial decision "to not award damages for the HVAC system was driven by the homeowner's lack of persuasiveness in complaining about items that the Court found cosmetic and immaterial to the contract and the construction." And the circuit court reaffirmed its decision to increase the damages awarded to the Homeowners consistent with Korobkin's expert opinion with regard to the cost to correct the HVAC system and duct work. As a result, on June 21, 2024, the circuit court entered a final order awarding the Homeowners $61,172 in monetary damages; $206,331.50 in attorney fees; and $25,887.76 in costs. Studio 76 appealed.

## II. ANALYSIS

### A. *Standard of Review*

The circuit court's decision to grant or deny a motion to reconsider is reviewed for an abuse of discretion. *See Everett v. Tawes*, 298 Va. 25, 40 (2019). This Court will not disturb the circuit court's factual determinations unless "they are 'plainly wrong or without evidence to support [them].'" *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 58 (2021) (alteration in original) (quoting Code § 8.01-680). "The circuit court's application of law to facts, however, is reviewed de novo." *Callison v. Glick*, 297 Va. 275, 288 (2019).

### B. *The circuit court did not abuse its discretion by reconsidering its initial rulings.*

Studio 76 contends that the circuit court erred by reconsidering its January 4, 2023 memorandum opinion "without a legal basis to revisit its prior ruling." In support, Studio 76 contends that the Homeowners merely "desire[d] to raise new arguments after the final decision" that "could have been asserted at trial," which "does not qualify as a valid excuse." We disagree.

"Motions to reconsider are generally 'not favored.'" *Everett*, 298 Va. at 40 (quoting *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 403 (1985)). The rationale for this general preference is that "judicial economy requires that litigants have one, but only one, full and fair opportunity to argue a question of law. The time required to hear a litigant reargue a question a second time must be taken from other litigants who are waiting to be heard." *Hechler Chevrolet, Inc.*, 230 Va. at 403. Nevertheless, a circuit court may reconsider an interlocutory ruling to correct error. *See Commonwealth v. McBride*, 302 Va. 443, 449-50 (2023); *Everett*, 298 Va. at 35, 40. And the circuit court's decision to do so is proper absent an abuse of discretion. *See Everett*, 298 Va. at 40. Where an error is apparent on the face of the record and brought to the circuit court's attention "before final judgment or decree, [the court] not only has the power," but the duty to correct the apparent error. *Kirn v. Bembury*, 163 Va. 891, 902 (1935); *Everett*, 298 Va. at 41. So when a litigant moves a court to reconsider an interlocutory ruling and the circuit court concludes that it has committed error, the court is under no duty to stand by its prior ruling. *See Kirn*, 163 Va. at 902; *Everett*, 298 Va. at 35, 41.

Here, Studio 76 contends that, absent a valid excuse, a litigant is limited to the legal reasoning and arguments made during the trial. We agree that, in most circumstances, the decision to deny a motion for reconsideration will not be deemed an abuse of discretion when a litigant has already had the opportunity to fully litigate an issue. *See Primov v. Serco, Inc.*, 296 Va. 59, 70 (2018) ("In . . . discretionary contexts, such as whether to grant a motion to reconsider or leave to amend, this Court has affirmed the circuit court's discretion to dismiss the claim with prejudice when amendment or reconsideration 'would accomplish nothing more than provide an opportunity for reargument of the question already decided.'" (quoting *Hechler Chevrolet, Inc.*, 230 Va. at 403)); *Thomas v. Commonwealth*, 62 Va. App. 104, 109-10 (2013) ("Without valid excuse, no party who has had his day in court can reopen the hearing . . . on the mere ground that

- 11 -

he wishes to interpose other defenses which he neglected to interpose before such decision was made." (alteration in original) (quoting *Holmes v. Holmes*, 7 Va. App. 472, 482 (1988))). However, this does not mean that a circuit court cannot reconsider a fully litigated issue. "[A] trial court may modify or rescind interlocutory orders 'at any time before final judgment,' and can, to put it plainly, 'change its mind while the matter is still pending.'" *Robbins v. Robbins*, 48 Va. App. 466, 474 (2006) (first quoting *Freezer v. Miller*, 163 Va. 180, 197 n.2 (1934); and then quoting *Pinkard v. Pinkard*, 12 Va. App. 848, 853 (1991)). Plainly, a circuit court *may* reconsider a prior interlocutory ruling when the court believes that it has committed an error. *See McBride*, 302 Va. at 449 (acknowledging "the recognized authority of a court to reconsider an erroneous or flawed decision"); *Thomas*, 62 Va. App. at 111 ("[A] trial court has the power to reopen and reconsider prior rulings while it has jurisdiction over the case.").

Hence, the circuit court's decision to reconsider its previous conclusions of law upon which it based its initial rulings, specifically the issue of whether the Homeowners' breach of the contract barred their recovery, was not an abuse of discretion. *See Thomas*, 62 Va. App. at 111 ("An abuse of discretion occurs only when 'reasonable jurists' could not disagree as to the proper decision." (quoting *Brandau v. Brandau*, 52 Va. App. 632, 641 (2008))). After reviewing the cases and arguments in the Homeowners' motion for reconsideration, the court determined that it had erred when issuing the initial memorandum opinion. Thus, due to the circuit court reconsidering its prior legal conclusion, the Homeowners were entitled to prevail on their counterclaim. The circuit court then further reviewed the evidence and contentions in the Homeowners' motion for reconsideration and reconsidered the amount of monetary damages that the Homeowners were entitled to recover, giving greater weight to Studio 76's failure to install a dual-zone HVAC system—"a bargained-for benefit . . . material to the contract"—and to Korobkin's expert opinion than Guo's "lack of persuasiveness." Similarly, as a result of the

- 12 -

reconsideration, the Homeowners, as the prevailing party based upon Paragraph 14 of the Contract, were entitled to recover their attorney fees and costs. Therefore, we find that the circuit court merely exercised its authority to reconsider its own interlocutory ruling by first reviewing and then re-reviewing its prior interlocutory decision and the evidence in the trial record before entering its final judgment on June 21, 2024. *See Thomas*, 62 Va. App. at 111.; *McBride*, 302 Va. at 449; *Robbins*, 48 Va. App. at 474. Thus, the reconsideration of the prior interlocutory decision was not an abuse of discretion.

C. *The circuit court did not err in finding that the first material breach doctrine did not apply.*

Studio 76 next contends that the circuit court erred when ruling that the first material breach doctrine was inapplicable to the facts here. In support, Studio 76 asserts that the doctrine does apply because the Homeowners failed to render full payment, which Studio 76 deems to be the first material breach of the Contract. We disagree.

"Generally, a party who commits the first breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 254 Va. 111, 115 (1997). This general rule is sometimes referred to as the "no recovery" rule. *See Spotsylvania Cnty. Sch. Bd. v. Seaboard Surety Co.*, 243 Va. 202, 215 (1992). When the first breach is a material breach, the "no recovery" rule is absolute: the party that committed the first material breach "cannot enforce the contract" and "the other party to the contract is excused from performing his contractual obligations." *See Horton*, 254 Va. at 115-16. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform th[e] obligation defeats an essential purpose of the contract." *Id.* at 115. "The type of evidence required to establish a material breach of contract will vary depending on the facts surrounding a particular contract." *Id.* at 116. But "[i]n many cases, a material breach is proved by establishing an amount of monetary damages flowing from the breach." *Id.*

- 13 -

By contrast, a breach that does "not go to the 'root of the contract' but only to a minor part of the consideration" is excepted from the general rule. *Id.* at 115 (quoting *Federal Ins. Co. v. Starr Elec. Co.*, 242 Va. 459, 468 (1991)). For example, in *Neely v. White*, 177 Va. 358, 366 (1941), the Supreme Court of Virginia held that one-fifteenth of the consideration due under a contract is a "minor part of the consideration." The Court reasoned that the portion of the contract left unperformed by reason of the breach—payment of $1,000 in notes—was "readily compensable by way of counterclaim," "easily ascertained and . . . liquidated," and could be "segregated from the total consideration of $15,000." *Id.*

Moreover, in the context of construction contract cases, our Supreme Court has indicated that strict application of the "no recovery" rule is relaxed "where the contractor and owner assert offsetting claims against each other, or where the departures from the contract do not involve real instances of bad faith." *Erlich*, 217 Va. at 115 (quoting *Kirk Reid Co. v. Fine*, 205 Va. 778, 788-89 (1965)).

Initially, Studio 76 asserts that the circuit court, after reconsidering its original decision, confirmed its decision that the Homeowners committed a material breach. It supports that argument, in part, by asserting that the circuit court's April 11, 2024 memorandum opinion, in which it relied on *Erlich*, failed to expressly rule whether the Homeowners' breach was material, only finding the "no recovery" rule to be inapplicable. However, we find that by holding that the "no recovery" rule did not apply in this case, the circuit court necessarily[12] reconsidered its original holding that the Homeowners' materially breached the contract. *See Horton*, 254 Va. at 115. In addition, to the extent that the April 11, 2024 memorandum opinion is ambiguous, the June 3, 2024 memorandum opinion demonstrates that the circuit court addressed the issue.

---

[12] We presume that the circuit court applied the law correctly. *E.g.*, *Shenk v. Shenk*, 39 Va. App. 161, 169 (2002).

- 14 -

There, the circuit court first found payment to be "a material term" but held that "the failure to make final payment should not be considered a material breach that would preclude the final exchanges of claims and offsets under a long-standing construction contract or any contract under which substantial payments or performance have been rendered." While Studio 76 is correct that substantial compliance and material breach cannot coexist, *see Culpeper Reg'l Hosp. v. Jones*, 64 Va. App. 207, 214 (2015), the circuit court, in reconsidering its prior ruling, did not hold that the Homeowners committed the first *material* breach of the contract. Instead, the court held that the Homeowners' first breach of the contract was not material, thus triggering application of the "no recovery" rule but not the first material breach doctrine.

And we find no error in the circuit court's final determination that the Homeowners substantially complied with the contract, such that the first material breach doctrine did not apply. Here, the Homeowners withheld only part of the final payment, which was a minor portion of the total consideration. *See Horton*, 254 Va. at 115. In fact, the record reflects that the Homeowners withheld the final $58,002 due under the Contract but had otherwise made all payments due under the Contract. Hence, the Homeowners paid a total of $376,300 on the adjusted contract price of $434,302, thereby withholding approximately 13.4% of the adjusted contract price, so we conclude that the amount withheld in this case amounts to a "minor part of the consideration." *Neely*, 177 Va. at 366 (holding that approximately 6.6% of the total consideration was a "minor part of the consideration"); *see also Federal Ins. Co.*, 242 Va. at 468 (finding that the exception to the "no recovery" rule set forth in *Neely* did not apply "where the breach was the failure to pay [approximately 89.8%] of the contract consideration").

Moreover, the Homeowners' breach was the withholding of the final payment owed to a contractor under a construction contract, and the "no recovery" rule is relaxed to some extent in construction cases such as the one at bar. *See Erlich*, 217 Va. at 114-15; *Seaboard Surety Co.*,

243 Va. at 215. The record supports the circuit court's finding that the Homeowners did not act in bad faith. *See Grayson*, 300 Va. at 58; *Rafalko v. Georgiadis*, 290 Va. 384, 398 (2015) (stating that "bad faith is a factual finding"). Indeed, the Homeowners only withheld funds that appeared necessary to complete or correct the work and a late fee penalty that they believed themselves to be entitled to collect under the Contract. Moreover, the Homeowners and Studio 76 filed competing and offsetting claims in the circuit court under the Contract. *Erlich* supports the proposition that the existence of either 1) lack of bad faith or 2) offsetting claims justifies relaxation of the "no recovery" rule where a breach of a construction contract is alleged. *See* 217 Va. at 115. The existence of both are present here.

Hence, in the context of this case, we conclude that the circuit court did not err by concluding that the Homeowners' breach was not material. *See Horton*, 254 Va. at 116. Thus, the circuit court did not err in concluding that the "no recovery" rule did not apply.

D. *The circuit court did not err in finding that the Homeowners' project oversight was not a material breach.*

Studio 76 further asserts that the Homeowners' alleged interference with its performance constituted a separate material breach and challenges the circuit court's finding that the Homeowners' interference did not "materially impede or hinder" construction. Studio 76 avers that the Homeowners violated the "implied obligation not to hinder the contractor's performance of its obligations." We disagree.

"There is an implied condition of every contract that one party will not prevent performance by the other party." *Whitt v. Godwin*, 205 Va. 797, 800 (1965). Here, the record supports the circuit court's finding that the Homeowners' alleged interference did not "materially impede or hinder" Studio 76's performance of the contract. *See Grayson*, 300 Va. at 58. Although the Homeowners monitored the work, Studio 76 substantially completed the project, except for certain outstanding items, and obtained a certificate of occupancy. Penati testified that

the work progressed despite the Homeowners' delays and frequent communications. Further, Guo testified that he did not interfere with Studio 76's work; rather, he visited the construction site to ensure remediation of issues and to meet with Studio 76 employees. Because the Homeowners' conduct did not "defeat[] an essential purpose of the contract," we therefore conclude that the circuit court did not err by concluding that the Homeowners' oversight and involvement during construction—though unwelcome—was not a material breach. *See Horton*, 254 Va. at 115.

E. *The circuit court did not err in awarding damages on the Homeowners' counterclaim.*

Studio 76 next contends that the evidence "was legally insufficient to support a damages award for breach of contract" on the Homeowners' counterclaim. Specifically, Studio 76 challenges the circuit court's decision to increase the damages awarded for HVAC repairs from $1,000 to $42,000. In support, Studio 76 argues that the award rested on an erroneous finding that Studio 76 had not completed duct work in the basement of the home or completed the installation of a dual-zone HVAC system, that the HVAC system was correctly installed, and that the award was contrary to the evidence. We disagree.

To the extent that Studio 76 challenges the circuit court's factual finding that Studio 76 did not complete duct work in the basement of the home or install a dual-zone HVAC system, we conclude that the circuit court's finding was not plainly wrong.[13] Direct and circumstantial evidence supported the trial court's finding. *See Etherton v. Doe*, 268 Va. 209, 212-13 (2004) ("[I]t is axiomatic that any fact that can be proved by direct evidence may be proved by

---

[13] There is no indication that Studio 76 challenged this factual finding below. *See* Rule 5A:18. Rather, in Studio 76's motion for reconsideration of the circuit court's April 11, 2024 memorandum opinion, it argued that the evidence showed that "the proper HVAC system was in fact installed" while pointing to an exhibit containing the "Product Data" for a 25HCB6 heat pump. We assume without deciding that it has preserved this issue for appellate review. *See* *McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018).

circumstantial evidence."). Penati admitted that a dual-zone system was not installed for the first and basement floors of the home. Guo also testified as to the lack of a temperature zone for the basement. Emails from Penati to Guo and from Guo to Penati circumstantially indicated that around the time Studio 76 ceased work on the home, it had yet to deliver on its promise to install a dual-zone HVAC system for the basement and first floor. Thus, we cannot say that the trial court was plainly wrong in determining that a dual-zone first and basement floor HVAC system was not installed as called for in the Contract.

In the alternative, Studio 76 also challenges the circuit court's determination that the HVAC system was incomplete and incorrectly installed, asserting that Korobkin "confirmed the correct system was installed." However, his expert testimony and report reflects the opposite conclusion. While Korobkin indicated that the outdoor heat pumps were the correct model, he identified numerous issues with the HVAC system as a whole. The contract called for a 16.5 SEER HVAC system, whereas Studio 76 installed a system that was only capable of achieving 15.5 SEER. He also indicated that the installed system was missing several components and the installation exhibited poor workmanship. Moreover, Studio 76 could not obtain Energy Star certification as installed. Overall, the circuit court's finding that the HVAC system was incomplete and incorrectly installed was not without evidence to support it.

Lastly, Studio 76 contends that there is insufficient evidence to support the $42,000 award of damages. It does not challenge the court's method of calculating damages.[14] Rather, Studio 76 challenges the underlying damage award because 1) Korobkin did not testify that

---

[14] Studio 76 does not argue that the circuit court erred by measuring damages using the cost method. *See Lochaven Co. v. Master Pools by Schertle, Inc.*, 233 Va. 537, 543 (1987) ("The cost measure is calculated on the basis of the cost to complete the contract according to its terms or the cost to repair what has been done so that the contract terms are met. The cost measure is appropriate *unless* the cost to repair would be grossly disproportionate to the results to be obtained, or would involve unreasonable economic waste."). So we do not opine on the propriety of the circuit court's method of calculating damages.

complete replacement of the HVAC system was necessary and 2) the damage award was based on Korobkin's estimate, which Studio 76 contends "was for total replacement of the HVAC system." We disagree.

We review a circuit court's award of damages to determine "whether there were 'sufficient facts' to support the award." *Kirdassi v. White*, 84 Va. App. 260, 295 (2025) (quoting *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 399 (2012)). The circuit court credited Korobkin's expert opinion, and we will not disturb its credibility determination on appeal. *See deCamp v. deCamp*, 64 Va. App. 137, 155 (2014). Korobkin estimated that the cost to *repair* the existing HVAC system to contract specifications was $42,100. There is no indication in the record that Korobkin's repair estimate was for *replacement* of the entire HVAC system—as Studio 76 points out, Korobkin did not testify that the entire HVAC system needed to be replaced. Korobkin's report and expert testimony, which the circuit court found reasonable and relied upon for calculating damages, provided the circuit court with sufficient evidence of the cost to repair the defects caused by the "incomplete and incorrect installation" of the HVAC system. Hence, we sustain the judgment of the circuit court awarding $42,000 on the Homeowners' counterclaim.[15]

### III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*

---

[15] The circuit court awarded the Homeowners $61,172 on their counterclaim. This award does not appear to include an offset for the $16,000 retained under the liquidated damages clause. However, Studio 76 only challenges the amount awarded for HVAC system deficiencies. Hence, we do not consider other portions of the circuit court's award. *See Commonwealth v. Brown*, 279 Va. 235, 241 (2010) ("The Court of Appeals can only consider issues properly brought before it by the litigants.").